Theodore Thelander et al., Appellees, *v.* City of Cleveland et al., Appellants.

(Nos. 40371, 40397 and 40886—Decided July 30, 1981.)

*Mr. Shimon Kaplan,* for plaintiffs-appellees.

*Mr. James Smith,* for defendant-appellee.

*Mr. Thomas Wagner,* director of law, for defendants-appellants.

*Mr. Thomas Dettelbach,* for defendant-appellant ARA Services, Inc.

JACKSON, P.J. On September 20, 1976, the Cleveland City Council enacted enabling Ordinance No. 2251-75[1] which authorized and directed the administration of the city of Cleveland to enter into a lease by way of concession for the operation of a restaurant, bar and cafeteria at Cleveland Hopkins Airport.

Fourteen interested parties obtained the plans and specifications from the Division of Purchases and Supplies of the city of Cleveland; three of these parties (American Merchandising Services, ITT Service Industries, and Kanner Industries) returned the plans and specifications to the city in August 1978 without submitting a bid. On August 7, 1978, the city held a pre-bidding conference at the airport, which was attended by seven of the potential bidders who had obtained plans and specifications.

The city issued five addenda to the plans and specifications prior to the date that bids were submitted. Copies of the addenda were sent to every potential bidder who had obtained the plans and specifications and who had not returned them. Consequently, the potential bidders who had returned the bids and specifica-

---

[1] Pursuant to Ordinance No. 2251-75, the city prepared plans and specifications, and advertised for bids on July 5 and July 12, 1978 in the City Record.

tions without submitting bids were not notified of the addenda. The material provisions of each of the addenda are set forth below:

*(1) Addendum No. 1 — July 19, 1978*

The original plans and specifications had divided the fifteen-year lease into a primary and secondary term. The primary term was the period during which the successful bidder would construct the improvements called for by the specifications; the secondary term was the remainder of the fifteen-year lease. During the primary term, the lessee would pay to the city $20,000 per month. The primary term could extend no longer than five months after "commencement of the lease." During the secondary term the lessee would pay to the city twelve percent of the gross revenues from sale of non-alcoholic products and eighteen percent of gross revenues from the sale of alcoholic products, or the guaranteed minimum rent promised by the lessee, whichever was greater. The specifications specifically provided that the lease would expire ten years after "commencement of the lease," and that the lessee could, at its option, extend the lease for a single five-year period.

Addendum No. 1 divided the primary term into two parts. The new primary term was to run from commencement of the lease until occupancy of the premises by the lessee; during this period no rent would be charged. The secondary term extended until completion of the improvements called for in the specifications. The rent during the secondary term would be $20 per square foot occupied. The primary and secondary terms could not exceed five months in total. The tertiary term would run for the same period, and require the same rent, as the secondary term referred to in the original specifications.

*(2) Addendum No. 2 — July 19, 1978*

The second addendum provides in full as follows:

"No earlier than Fifteen (15) days after the advertisment of bids in the City Record or *MONDAY, AUGUST 7, 1978, at 10:00 A.M.* all interested parties received bidding specifications will be invited to a pre-bidding conference at the Office of the Director of Port Control, Cleveland Hopkins International Airport, Cleveland, Ohio, 44135."

*(3) Addendum No. 3 — August 22, 1978*

The third addendum postponed the bid due date from August 31, 1978, to October 6, 1978. The postponement of the due date was not advertised. City officials testified that everybody at the pre-bid conference requested or agreed to the postponement.

The addendum also contained answers to a list of questions raised by the parties present at the pre-bid conference. Question number thirteen (13) was as follows:

"Q. Is more square footage available for the main dining room than at present?

"A. An additional 6,000 square feet can be constructed over the moat area to the North of the present restaurant location. (See attached sketch)."

The area referred to in the answer to question thirteen was adjacent to the current restaurant, bar and coffee shop. No building or other structure currently existed in that space; utilization of that space would require the construction of a two-story structure.

*(4) Addendum No. 4 — Sept. 13, 1978*

The most important provision of the fourth addendum was as follows:

"The following is to be added to the answer to question thirteen in Addendum #3.

"In the event that the successful bidder elects to utilize part or all of the available area, the minimum investment in improvements acceptable to the city shall be increased by an amount determined by multiplying the additional square footage elected to be utilized by $125.00 per square foot."

*(5) Addendum No. 5 — Sept. 27, 1978*

Addendum No. 5 required the successful bidder to hire the current employees, "subject to each employee's ability to perform his or her job satisfactorily."

The original specifications merely encouraged the successful bidder to retain the employees of the current operator of the restaurant:

"The City encourages the successful bidder, to the extent possible, to retain the employees currently employed in the food and beverage concession at the Airport and to maintain the current wage and benefits package for said employees."

The city received four bids for the lease by way of concession. Two of the bids were immediately rejected because the bidders' guaranteed minimum rent over the fifteen-year period was less than ten million dollars; the two other bidders (ARA Services, Inc. and Sky Chefs) each promised to pay a minimum rent of over twenty million dollars.

The bids were reviewed by the Department of Port Control. The review process is summarized in four memoranda from William Robinson, an employee of the department, to Mary Vodicka, Director of the Department of Port Control. ARA and Sky Chefs made an oral presentation of their bids to Mr. Robinson on October 18 and 25, 1978, respectively. At each of these post-bid conferences Mr. Robinson asked a number of questions concerning the bidders' proposals. Many of these questions elicited information which is not apparent from the bids; for example, Sky Chefs stated that it would consider expansion into the 6,000 square foot area after the first ten years of the lease, and ARA promised that the restaurant would be a unionized facility. Mr. Robinson sent memoranda to Miss Vodicka regarding each of the post-bid conferences, and sent memoranda comparing the two bids. He recommended that the lease be awarded to ARA. The main differences between the two bids are set forth below:

*(a) Guaranteed Minimum Rent*

Sky Chefs promised a higher guaranteed minimum rent over the fifteen-year period of the lease than ARA, but ARA offered to make higher payments during the initial six years of the agreement. The bids were as follows:

Rents Offered

|  | ARA | Sky Chefs | High Bidder | Difference |
|---|---|---|---|---|
| 1st Year | $ 543,996 | $ 375,000 | ARA | $ 168,996 |
| 2nd Year | $ 660,000 | $ 450,000 | ARA | $ 210,000 |
| 3rd Year | $ 710,000 | $ 550,000 | ARA | $ 160,000 |
| 4th Year | $ 810,000 | $ 675,000 | ARA | $ 135,000 |
| 5th Year | $ 910,000 | $ 825,000 | ARA | $ 85,000 |
| 6th Year | $ 1,010,000 | $ 1,000,000 | ARA | $ 10,000 |
| 7th Year | $ 1,100,000 | $ 1,200,000 | Sky Chefs | $ 100,000 |
| 8th Year | $ 1,200,000 | $ 1,425,000 | Sky Chefs | $ 225,000 |
| 9th Year | $ 1,300,000 | $ 1,675,000 | Sky Chefs | $ 375,000 |
| 10th Year | $ 1,400,000 | $ 1,925,000 | Sky Chefs | $ 525,000 |
| 11th Year | $ 1,650,000 | $ 2,100,000 | Sky Chefs | $ 450,000 |
| 12th Year | $ 2,000,000 | $ 2,300,000 | Sky Chefs | $ 300,000 |
| 13th Year | $ 2,300,000 | $ 2,500,000 | Sky Chefs | $ 200,000 |
| 14th Year | $ 2,600,000 | $ 2,700,000 | Sky Chefs | $ 100,000 |
| 15th Year | $ 2,900,000 | $ 2,900,000 |  | -0- |
| TOTAL | $21,093,996 | $22,600,000 | Sky Chefs | $1,506,004 |

In his recommendation to Director Vodicka, Mr. Robinson included a "present value analysis" of the two bids, which, according to Mr. Robinson, accounted for the effects of inflation:

| | Minimum Guarantee | | | Rate of Inflation | | |
|---|---|---|---|---|---|---|
| | | 6% | 7% | 8% | 9% |
| ARA | $21,093,996 | $12,068,000 | $11,091,892 | $10,219,414 | $9,438,786 |
| Sky Chefs | $22,500,000[2] | $12,655,000 | $11,582,481 | $10,623,729 | $9,764,824 |

Robinson stated that this analysis showed that "the real difference in the value of the bids is much less than the total figure indicates."

### (b) Investment in Improvements

Sky Chefs, the current concessionaire, promised to spend $2,300,000 in upgrading the existing restaurant, bar and coffee shop. ARA promised to spend $2,000,000 on improving the existing facilities and $750,000 in constructing the additional 6,000 square foot facility. Since under the terms of the lease all capital improvements were to become the property of the city, the ARA proposal in this respect could reasonably be considered superior to the proposal by Sky Chefs.

### (c) Capacity of Restaurant and Bar

According to the October 26, 1978 memorandum by Mr. Robinson, it was indicated by Sky Chefs in the presentation of their bid that the seating capacity of the facilities would be changed as follows:

| | Present | Proposed | Change | |
|---|---|---|---|---|
| Coffee Shop | 56 | 142 | +86 | |
| Cocktail Lounge | 88 | 142 | +54 | |
| Restaurant | 160 | 100 | −60 | |
| TOTAL | 304 | 384 | +80 | (+26%) |

In their bid, ARA Services promised to provide a much larger seating capacity than did Sky Chefs:

| | |
|---|---|
| Restaurant | 176 seats |
| Bar | 152 seats, 30 counter stools |
| Coffee Shop | 162 seats |
| TOTAL | 490 seats plus 30 counter stools |

### (d) Decor, Uniforms, and Atmosphere

The October 30, 1978 memorandum by Mr. Robinson indicated that while design and appearance are important to the success of a restaurant, they are matters of taste and cannot be compared. Director Vodicka testified that she preferred the decor and theme proposed by ARA, and that this was a factor which influenced her to recommend the acceptance of the ARA bid.

Following the post-bid conference,

---

[2] This figure is erroneous. Sky Chef's minimum guarantee was actually $22,600,000.

representatives of ARA Services communicated with city officials on several occasions to clarify or improve the bid by ARA. On November 3, 1978, Mr. Till of ARA sent the following telegram to Director Vodicka:

"Confirms telephone conversation this date, ARA will employ all existing personnel currently employed by Skychef in restaurant facility at Cleveland Hopkins Airport should we become operator of the facility. Should it be necessary to temporarily layoff any employees during facility construction period, such employees will be given an opportunity to return to work on seniority basis when construction has been completed. We will fully comply with paragraph C-8 in Part C of specifications as amended by Addendum 5. Regarding menu pricing, ARA will offer a half pound ground beef platter combination at $2.95 in the restaurant and make available a children's menu which includes a hamburger plate with french fries and beverage for $1.25. We also offer a standard quarter pound burger for $1.35 in the buffeteria. Airport employees are given a 20 percent discount on purchases."

On November 6, 1978, Mr. Scudder of ARA sent a telegram to Mr. Wheeler, the city's contract compliance officer, promising that forty percent of the workforce at the facility would be comprised of individuals from minority groups. On December 11, 1978, officials of ARA sent two letters to Mr. Wheeler renewing the pledge of employing forty percent minorities, stating that ARA would recognize the union which currently represented the employees of the restaurant, and stating that ARA would retain the current minority and women supervisors at the facility.

All of the above communications were made at the request of Director Vodicka and Mr. Wheeler. Director Vodicka testified that the information regarding whether the present employees would be retained and what they would be paid was obtained at the request of Mr. Forbes, Chairman of the finance committee of the Cleveland City Council.

These communications changed ARA's bid in the following respects:

1) Under Addendum No. 5, ARA had promised to retain employees subject to the employees' ability to perform satisfactorily; the telegram of November 3, 1978 does not contain this reservation.

2) The original bid listed the hamburger platter at $3.25; the telegram of November 3, 1978 reduced this to $2.95.

3) In its bid ARA did not promise to hire any specific percentage of persons from minority groups, nor did it agree to recognize the union, nor did it agree to retain minority and women supervisors. All three promises were made to Mr. Wheeler on December 11, 1978.

The Director of Law advised the Board of Control that it could not consider any of these communications in reaching a decision.

On November 22, 1978, the Board of Control of the city of Cleveland adopted a resolution awarding the lease by way of concession to ARA Services. On November 29, 1978, the plaintiffs Theodore Thelander and Iva Wireman filed this action against the city of Cleveland and Director Vodicka seeking an injunction and a declaratory judgment. The plaintiffs requested the court to (1) enjoin the city from entering into a contract with ARA without first obtaining the approval of city council; (2) declare that Sky Chefs was the highest and best bidder; (3) declare that in awarding the lease to ARA the city had failed to comply with the charter and the ordinances of the city of Cleveland; (4) declare that it would be in contravention of law for the city to enter into the contract with ARA; and (5) award plaintiffs their attorney fees in prosecuting the action.

Mr. Thelander brought suit as a taxpayer; Mrs. Wireman sued in her capacity as an employee of the current conces-

sionaire, Sky Chefs. The court later permitted her to proceed as a taxpayer rather than as a representative of the Sky Chefs' employees. The plaintiffs filed a motion for a temporary restraining order with the complaint.

The motion for a restraining order was heard November 30, 1978. The parties stipulated at that time that the city would not execute any contract with ARA Services until the next scheduled hearing, on December 5, 1978. On December 5, the city agreed that it would not enter into any contract with ARA Services until the next hearing on December 14, 1978, and that before that date the Board of Control would reconvene and decide whether the bids were lawful, and if so, which was the highest and best bid.

Also on December 5, 1978, the plaintiffs amended their complaint to include ARA Services and Sky Chefs as defendants. Both new party defendants filed answers. Sky Chefs filed a cross-claim against the other defendants, requesting the court to declare that the bid of ARA Services was illegal and void, and to require the city to promulgate new specifications, readvertise for bids, and take new bids before entering into the lease.

On December 5, 1978, the Cleveland City Council enacted Ordinance 3048-78, repealing Ordinance 2251-75, which had authorized the Board of Control to award this lease. The Mayor vetoed the ordinance, and council overrode the veto on December 22, 1978. The repealing ordinance became effective on December 23, 1978.

Prior to the effective date of Ordinance No. 3048-78, the Board of Control met again, on December 8, 14 and 15, 1978. The board unanimously awarded the lease by way of concession to ARA Services.

Trial on the complaint and cross-claim continued on December 18, 1978, and on December 22, 1978, the court entered a temporary restraining order forbidding the defendants city of Cleveland and ARA Services from entering into a lease. The order was extended for an additional two weeks on January 6, 1979. On January 19, 1979, the trial court entered a final judgment in favor of the plaintiffs and the defendant Sky Chefs. The court declared all bids based upon the advertisement of July 5 and 12, 1978 to be null and void; declared the resolution of the Board of Control awarding the lease by way of concession to ARA Services to be null and void; enjoined the city and ARA from entering into the lease contract; and awarded plaintiffs their attorney fees.[3]

---

[3] The court based its decision on the following conclusions of law:

"1.   The plaintiffs have standing to bring and maintain this action for declaratory judgment and equitable relief as residents and taxpayers of the defendant City pursuant to Sections 90 through 92 of the Charter of the defendant City as well as pursuant to other provisions of Ohio law, including Chapter 2721 of the Ohio Revised Code.

"2.   The advertisement for bids for the Hopkins Restaurant Concession * * * was fatally defective because, contrary to the requirements of Section 181.21 and Section 183.06 of the Codified Ordinances of the defendant City, said advertisement did not set forth the terms, conditions and requirements contained in ordinance No. 2251-75 passed by Council of the defendant City on September 20, 1976.

"3.   The specifications for the proposed Lease By Way of Concession for the Hopkins Restaurant Concession as amended by the defendant City, called for bids for a term which exceeded the authorization of Council of the defendant City as set forth in Ordinance No. 2251-75, and therefore said specifications were unlawful and incapable of being the basis for the submission of competitive bids for the proposed Hopkins Restaurant Concession.

"4.   The defendant City extended the time within which bids were to be submitted for the proposed Hopkins Restaurant Concession without advertising such an extension of time

The defendants city of Cleveland, Director Vodicka, and ARA Services appeal. On May 16, 1979, the trial court found the reasonable value of the taxpayer's attorney fees to be $30,463.82 and entered judgment for that amount.

Because we are of the opinion that the trial court was without jurisdiction to adjudicate the taxpayer suit initiated by plaintiffs-appellees Thelander and Wireman, the assigments of error which relate solely to the taxpayer suit are separately discussed below.

## I

### Disposition of Assignments of Error Relating Solely to Taxpayer Suit.

For their first assigned error[4] appellants contend that the trial court lacked subject-matter jurisdiction over the taxpayer suit brought by Thelander and Wireman. In assignments of error numbers seven through fourteen[5] appellants challenge the award of attorney fees that the court granted to the taxpayers in the amount of $30,463.82.

---

contrary to the requirements of Ordinance No. 2251-75 and Section 181.21 of the Codified Ordinances of the defendant City, thereby invalidating the process of seeking competitive bids for the proposed Hopkins Restaurant Concession.

"5. By amending the original specifications in the substantial and material respect of adding an option to bid upon and use up to an additional 6,000 square feet of space without readvertising for bids, the defendant City invalidated the process seeking competitive bids for the proposed Hopkins Restaurant Concession.

"6. The bid submitted by defendant ARA on October 6, 1978 for the proposed Hopkins Restaurant Concession did not conform to the specifications as amended in several material respects, and was therefore incapable of being the basis for an award by the defendant City of a Lease By Way of Concession.

"7. The statements, promises and representations made by defendant ARA to the defendant Vodicka and to the defendant City after the bids were opened constituted illegal attempts to modify, amend and supplement ARA's original bid, thereby rendering ARA's bid incapable of being the basis for an award by the defendant City for a Lease By Way of Concession.

"8. The procedures described in paragraphs 32 through 35, inclusive, in the Findings of Fact above followed by the Board of Control of the defendant City were illegal and contrary to law, and thus rendered Resolution No. 609-78 adopted by the Board on December 14, 1978 invalid.

"9. On December 14, 1978, the Board of Control of the defendant City abused its discretion in determining that the bid of defendant ARA was the highest and best bid submitted for the Hopkins Restaurant Concession, and the Board's action on December 14, 1978 authorizing and directing defendant Vodicka to enter into a Lease By Way of Concession with defendant ARA is void.

"10. At all times relevant hereto prior to December 23, 1978, defendant Vodicka and the defendant City lacked authority to enter into a Lease By Way of Concession with respect to the Hopkins Restaurant Concession because, contrary to the requirements of Section 183.03 of the Codified Ordinances of the defendant City, Council of the defendant City had not approved of the Lease By Way of Concession proposed by defendant Vodicka and the defendant City.

"11. At all times relevant hereto on and after December 23, 1978, defendant Vodicka and the defendant City lack authority to enter into a Lease By Way of Concession with respect to the Hopkins Restaurant Concession because, pursuant to Section 183.03 of the Codified Ordinances of the defendant City, Council of the defendant City disapproved of the Lease By Way of Concession between the defendant City and the defendant ARA as proposed by defendant Vodicka by adopting, over the Mayor's Veto, Ordinance No. 3048-78 repealing Ordinance No. 2251-75."

[4] *First Assignment of Error*

"The trial court did not have jurisdiction to entertain this taxpayer's action because plaintiffs did not comply with the requirements of the Cleveland City Charter."

[5] The seventh through fourteenth assignments of error, renumbered, are as follows:

Section 87 of the Charter authorizes the city's director of law to apply for an injunction to prevent certain unlawful or unauthorized acts, including the performance of contracts made on behalf of the city in contravention of law.[6] Under Section 90 of the Charter, a taxpayer may also apply for an injunction to restrain the execution of a contract which was entered into unlawfully, provided that the taxpayer makes a *prior written request* upon the director of law, to institute such an action:

"Taxpayer's Suit

"In case the Director of Law, upon written request of any taxpayer of the City, fails to make any application provided for in the preceding three sections, such taxpayer may institute suit or proceedings for such purpose in his own name on behalf of the City. No such suit or proceeding shall be entertained by any court until such request to the Director of Law shall first have been made, nor until the taxpayer shall have given security for the costs of the proceedings." (Cleveland City Charter, Section 90.)

In the case at bar, appellees Thelander and Wireman served the written request upon the director of law simultaneously with the filing of the complaint. The letter to the director of law reads as follows:

"Anticipating that a taxpayer's request upon you to institute the aforementioned legal action would be a futile effort, as you have already publicly stated that you are in favor of the City of Cleveland entering into such an agreement with ARA Services, Inc., on behalf of our clients we have already prepared a Complaint for Declaratory Judgment and Injunctive Relief, as well as a Motion for Temporary Restraining Order and Preliminary Injunction. Copies of those pleadings are attached.

"As indicated in Paragraph 20 of the Complaint, should you decide to perform

*Seventh Assignment of Error*

"Plaintiffs were not entitled to an award of their attorneys' fees."

*Eighth Assignment of Error*

"The determination of attorneys' fees is null and void because the trial court did not have jurisdiction to hold a hearing to determine the amount of attorneys' fees after appellants had filed their notice of appeal in case No. 40371."

*Ninth Assignment of Error*

"The trial court erred in the standard applied to determine the 'reasonable compensation' for plaintiffs' attorneys."

*Tenth Assignment of Error*

"The trial court erred and abused its discretion in refusing to allow appellants to offer evidence relating to the principal action and refusing to allow appellants' counsel to refer to those matters in closing argument."

*Eleventh Assignment of Error*

"The trial court abused its discretion in determining that $75 per hour was a reasonable rate for Mr. Kaplan."

*Twelfth Assignment of Error*

"The trial court erred and/or abused its discretion in awarding attorneys' fees for counsel who did not participate in the trial of this action."

*Thirteenth Assignment of Error*

"The trial court erred in awarding plaintiffs' attorneys' fees and 'costs' incurred by plaintiffs' attorneys in the prosecution of their claim for attorneys' fees."

*Fourteenth Assignment of Error*

"The trial court erred in awarding to plaintiffs as 'costs', expenses incurred for deposition transcripts and expert witness fees."

[6] Section 87 provides:

"Application for Injunction.

"The Director of Law shall apply, in the name of the City, to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the City, or the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the City in contravention of law, or which was procured by fraud or corruption."

the obligation placed upon you, pursuant to Section 87 of the Charter of the City of Cleveland, and immediately: * * * apply, in the name of the city, to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the city, or the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the city in contravention of law, or which was procured by fraud or corruption, plaintiffs will immediately dismiss the action."

Both this court of appeals, and the Ohio Supreme Court, in interpreting Section 90 of the Cleveland City Charter and the substantially identical statutory provision contained in R.C. 733.59,[7] have held that service of a prior written request upon the director of law, asking that he institute suit on behalf of the city, is a mandatory prerequisite to the initiation of a taxpayer's suit. *State, ex rel. City Council,* v. *Board* (1974), 40 Ohio App. 2d 299 ·[69 O.O.2d 273]; *State, ex rel. White,* v. *Cleveland* (1973), 34 Ohio St. 2d 37 [63 O.O.2d 79]. This principle was reaffirmed in the recent case of *State, ex rel. Schulman,* v. *Cleveland* (Nov. 13, 1980), Cuyahoga App. No. 41600, unreported. The only exception to the rule requiring prior written request upon the director of law is where such a request would be "futile." The Supreme Court has twice held that a director of law had waived the requirement of a prior written request, by affirmatively denying the relief requested by the taxpayer, before the taxpayer suit was instituted. In *State, ex rel. Nimon,* v. *Village of Springdale* (1966), 6 Ohio St. 2d

1 [35 O.O.2d 1], the court held in paragraph three of the syllabus:

"Where a solicitor of a municipal corporation transmits a written opinion advising its council to refrain from acting on a pending matter and the council, in reliance upon the opinion, refrains from acting, a request upon the solicitor to institute suit to compel the council to act on the matter would be unavailing; the municipal corporation is deemed to have refused to grant consent to become a party plaintiff in any such suit; and a taxpayer's noncompliance with the condition of Section 733.59, Revised Code, requiring a written request to, and a failure by, the solicitor to institute suit, is excused."

In *State, ex rel. White,* v. *Cleveland,* (1973), 34 Ohio St. 2d 37 [63 O.O.2d 79], the court stated in paragraph two of the syllabus that:

"Where a taxpayer requests the Law Director of a municipality to advise the Commissioner of the Division of Building to permit the inspection and copying of public records, as required by R.C. 149.43, and the Law Director refuses, relying upon an alleged policy of the municipality, it is clear that a written request upon the Law Director to maintain a mandamus action against the commissioner, pursuant to R.C. 733.58, would be futile and unavailing, and such request, required by R.C. 733.59, is excused. (*State, ex rel. Nimon,* v. *Springdale,* 6 Ohio St. 2d 1 [35 O.O.2d 1], approved and followed.)"

The test adopted by the court in both cases was as follows:

"* * * Did the circumstances here

---

[7] R.C. 733.59 provides:

"Suit by taxpayer.

"If the village solicitor or city director of law fails, upon the written request of any taxpayer of the municipal corporation, to make any application provided for in sections 733.56 to 733.58 of the Revised Code, the taxpayer may institute suit in his own name, on behalf of the municipal corporation. Any taxpayer of any municipal corporation in which there is no village solicitor or city director of law may bring such suit on behalf of the municipal corporation. No such suit or proceeding shall be entertained by any court until the taxpayer gives security for the cost of the proceeding."

show that it would have been unavailing to have made a request upon the solicitor." (34 Ohio St. 2d at 42; 6 Ohio St. 2d at 6).

In the case at bar, the only circumstance proven by appellees, which would tend to show that a prior written request upon the director of law would have been unavailing, was the fact that the director of law was a member of the Board of Control, and that the board had voted to award the lease by way of concession to ARA Services, Inc. on November 22, 1978. Appellees did not adduce any evidence showing that the director of law attended and participated in the November 22, 1978 meeting of the Board of Control, nor was any evidence adduced tending to show that the issues raised by the appellees in their complaint were brought to the attention of the director of law prior to the filing of the complaint.

Appellees contend that following the filing of the complaint for injunction, it became apparent that the director of law would oppose it, and that in retrospect the filing of a request to institute suit would have been futile. This argument is not persuasive, for it renders the service of a prior request to institute suit unnecessary in practically every case; whenever the law director opposes the taxpayer suit, the taxpayers could claim that service of a prior written request would have been futile. This proposition was impliedly rejected in *State, ex rel. Schulman,* v. *Cleveland, supra.* As noted by the Supreme Court, the requirement of serving upon the director of law a prior written request to institute suit "* * * is intended to prevent the municipal corporation from becoming a plaintiff in court without its consent." *State, ex rel. Nimon,* v. *Village of Springdale* (1966), 6 Ohio St. 2d 1, 6 [35 O.O.2d 1].

In order to maintain an action as a taxpayer suit, the mandatory procedural requirements must be "met or waived." *State, ex rel. White,* v. *Cleveland* (1973), 34 Ohio St. 2d 37 [63 O.O.2d 79]

(paragraph three of the syllabus). In the case at bar, the requirement of a prior written request upon the director of law was neither met nor waived. The court of common pleas was without jurisdiction to entertain the taxpayer suit instituted by appellees, and this court of appeals is therefore without jurisdiction to pass upon the merits of the taxpayers' claims.

Accordingly, the judgment of the trial court granting an injunction and awarding attorney fees on behalf of the taxpayers-plaintiffs is reversed and the taxpayers' complaint is hereby ordered dismissed with prejudice. We decline to review the assignments of error relating to the attorney fee award, in view of our holding that both the trial court and this court of appeals lack jursidiction to determine any non-jurisdictional issues in the taxpayer suit.

We therefore sustain the appellants' first assignment of error, and dismiss assignments of error numbers seven through fourteen.

II
Disposition of Assignments of Error Relating to Cross-Claim.

*Second Assignment of Error*

"The Board of Control did not abuse its discretion in awarding the concession to ARA.

"A. The Board's exercise of its discretion is entitled to a presumption that it was sound.

"B. Nothing in the transcripts of the meetings of the Board of Control or the record in this action indicates that the Board abused its discretion.

"C. The trial court should have determined whether the Board of Control abused its discretion solely upon the transcripts of the Board's meetings."

*Third Assignment of Error*

"Plaintiffs and Sky Chefs waived any alleged errors that they did not raise before the Board of Control despite being given a full and fair opportunity to do so."

The cross-claim instituted by appellee

Sky Chefs against the city of Cleveland, Director Vodicka, and ARA Services was not an appeal from the decision of the Board of Control, but an original action for an injunction. The Board of Control is not a "quasi-judicial" agency, and appeals may not be taken from its decisions pursuant to R.C. Chapter 2506. *M. J. Kelley Co.* v. *Cleveland* (1972) 32 Ohio St.2d 150 [61 O.O.2d 394]. The proceeding before the court of common pleas was a trial *de novo;* all parties were free to present any evidence on the issues of whether the Board of Control abused its discretion in awarding this contract, whether the board acted in contravention of law, and whether the contract was procured through fraud or corruption. Since the proceeding before the Board of Control was not "quasi-judicial," *M. J. Kelley Co.* v. *Cleveland, supra,* the parties were not limited to the evidence or the arguments made before the Board of Control in the proceedings before the court of common pleas. These assignments of error are overruled.

### Fourth Assignment of Error

"There were no illegalities in the bidding process that would require the trial court to set aside ARA's bid or the entire bidding process."

In this assignment of error the appellants challenge eight findings of the trial court regarding alleged illegalities. Each of these sub-assignments of error is separately discussed below:

### Assignment of Error Number 4(A)

"The advertisement inviting bids fully complied with the requirements of the Codified Ordinances:

"1. The omitted phrases were not 'terms, conditions and requirements' to be included in the advertisement.

"2. As reference was made in the advertisement to the specifications on file, such specifications became part of the advertisement itself.

"3. Even if the language did amount to terms and conditions, their omission was not such as to make the advertisement fatally defective."

Section 183.06 of the Codified Ordinances of the city of Cleveland sets forth the content requirements of an advertisement by the city for a lease by way of concession. The pertinent portion of that ordinance provides:

"When real estate is to be leased or sold by or for the City the Commissioner of Purchases and Supplies shall advertise such sale or lease in the same manner as in the case of other purchases and sales. The advertisement in case of lease by way of concession shall set forth the terms, conditions and requirements contained in the ordinance authorizing such lease by way of concession * * *."

The general provision for advertisement of bids is contained in Section 181.21 of the Codified Ordinances, which states:

"Every advertisement for bids shall specify the place where bids will be received and the day and place where the same will be opened, and shall state that at 12:00 noon on the last day for filing bids made pursuant to advertisement, the Commissioner of Purchases and Supplies will open and read all such bids."

The record discloses that the advertisement in the case *sub judice* was fatally defective because it did not set forth the "terms, conditions and requirements contained in the ordinance" authorizing the lease. The terms, conditions and requirements contained in the ordinance which were omitted from the advertisement were that the lease would extend no more than fifteen years beginning upon execution of the lease, and that the contract would be awarded to the highest and best bidder.

We have failed to discover any cases in Ohio which deal with the issue of whether a bidding process is rendered invalid or void because the advertisement for bids omits terms, conditions or requirements which are required by city ordinance or by state statute. *Lancaster* v.

*Miller* (1898), 58 Ohio St. 558, and *Mc-Cloud* v. *Columbus* (1896), 54 Ohio St. 439, merely held that where a municipal corporation fails to advertise the bids in accordance with the *mode* and *time* prescribed by statute, the municipality lacks power to award the contract to a bidder. In *Thomas* v. *Bd. of Commrs.* (1923), 28 Ohio App. 8, the Butler County Court of Appeals ruled that where a county board of commissioners failed to notify taxpayers that certain road improvements would be made, and failed to specify a time and place where objections could be heard, as required by G.C. 6912, the board was without authority to enter into a contract for the improvements.

Section 183.06 of the Codified Ordinances is based upon the presumption that the omission from the advertisement of a term, condition or requirement of the enabling ordinance discourages potential bidders from responding to the advertisement. We are persuaded that the omissions from the advertisement in the case at bar were not so insignificant that this court can conclude, as a matter of law, that no potential bidders were discouraged. The letter and policy of Section 183.06 were violated. Consequently, we find that the bidding process was rendered void by the material omissions of the advertisement for bids, and that the trial court did not err in so finding.

*Assignment of Error Number 4(B)*
"The City validly and properly extended the time for submission of bids."

The deadline for submitting bids was postponed following the pre-bid conference, with the concurrence of all potential bidders who appeared. All bidders who still had the plans and specifications in their possession were notified of the new date.[8] Contrary to the assertion contained in the brief of the appellees, there was no showing that the announcement of the postponement was mailed "to favored bidders."

The Ohio Supreme Court has briefly addressed the issue of whether a public agency may amend the specifications of a contract without readvertisement. *State, ex rel. S. Monroe & Son Co.,* v. *Baker* (1925), 112 Ohio St. 356. The pertinent portion of that opinion is reproduced in full below:

"The next question relates to the changes and addenda in the plans and specifications between January 19th and February 6th. We will not discuss the nature of the changes and addenda which were in fact made, because this court is not in any sense expressing an approval of making changes and addenda after the advertisement is begun. It does appear, however, that the one change, which may have been made as late as February 6th, is of a most inconsequential character. Mistakes should of course be corrected, and explanations necessary to complete understanding of the plans and specifications should be given, and it is of course better to have such changes and addenda made before the letting of the contract than after. It does not appear that any discrimination was exercised in favor of any bidder or against any other bidder. No complaint is made by any bidder. The successful bidder and the director of highways are both satisfied, and it does not appear that any party to the proceeding had been in any wise prejudiced. A conclusive reason why no prejudice can result to any one in this controversy is that the advertisements call for unit bids. In any event, it is quite clear that no obligation is imposed by statute upon the director of finance to inquire into such matters, and that he is only concerned with the financial part of the transaction. This portion of the answer does not

---

[8] The specifications contained forms to be filled out and returned by bidders upon submission of their bids. Return of the specifications with those forms not filled out indicated that the bidder was no longer interested in the contract.

therefore state any defense." (112 Ohio St. at 362-363.)

The test, therefore, for determining whether the bidding process has been tainted by an amendment to the specifications is whether any of the bidders might have been prejudiced. The undisputed evidence was that no bidders objected to the postponement of the due date; moreover, the appellees presented no evidence of prejudice at trial in the court of common pleas. We find that the postponement of the due date of the bids was not shown to have favored or hindered any potential bidder, and that the bidding process was not thereby invalidated. The court's finding regarding this issue is unsupported by the evidence.

*Assignment of Error Number 4(C)*

"The City validly amended the bid specifications to allow construction of an additional 6,000 square feet."

Six weeks after the lease by way of concession was first advertised, and six weeks before the bids were ultimately due, the city amended the specifications to permit the bidders, if they chose, to construct a building adjacent to the existing restaurant which would expand the available area of the facilities by nearly forty percent. Three weeks later the city issued another addendum stating that the minimum required investment in the new building would be $125 per square foot. Of the two bidders who promised approximately the same amount of financial return to the airport and the city, ARA utilized the optional space, and Sky Chefs did not. The perceived superiority of the ARA bid was based mainly upon the additional investment in and the increased seating capacity of the facilities which would result from the construction of the new building.

These addenda to the specifications were not mere corrections or explanations, nor were the changes so minor that all bidders could have easily incorporated the addenda into their planning. The addenda in controversy radically changed the nature of the facility to be leased. If these changes had been made a part of the original specifications, no prejudice could have been shown; under the circumstances of the case at bar, however, it is reasonable to assume that the material alteration of the specifications after the pre-bid conference favored some bidders at the expense of others. As a glaring example of possible prejudice, the potential bidders who returned the bids and specifications prior to the issuance of the third and fourth addenda were never notified of the proposed alterations. Such alteration of the specifications, without readvertisement and recommencement of the bidding process, constituted an abuse of discretion on the part of city officials, and constituted sufficient grounds for enjoining the execution of the lease.

*Assignment of Error Number 4(D)*

"The lease term did not exceed the authorization of Council."

The trial court found that the specifications issued by the city permitted a term in excess of the fifteen year maximum established by council. The lease provides that the initial five-month period begins with "commencement of this lease," and that the lease shall expire ten years after it commences. Although the specifications and Addendum No. 5 are ambiguous, we find that the initial five-month period, during which the rent was to be lower, constituted a part of rather than an addition to the fifteen-year term of the lease. The initial five-month period, therefore, does not extend the term of the lease beyond fifteen years. The finding of the trial court was error.

*Assignment of Error Number 4(E)*

"The ARA bid submitted to the City was in conformance with the specifications and valid in all respects."

The trial court found that the ARA bid failed to conform to the specifications in four respects:

"(a) The ARA bid failed to promise

to retain current employees, as called for in the fifth addendum;

"(b) The ARA bid did not contain a pro forma profit and loss statement for the first year;

"(c) The pro forma profit and loss statement which was submitted was inaccurate, incomplete and misleading; and

"(d) The additional 6,000 square feet was to be used, under the bid, for a cocktail lounge rather than the main dining room."

The form issued by the city for acceptance of the bids contains the following language:

"The undersigned proposes to enter into a Lease By Way of Concession for the operation of a Restaurant, Bar and Cafeteria-Style Coffee Shop Concession at Cleveland Hopkins International Airport in accordance with the specifications herein contained and to pay the City for each term of the term rents hereinafter set forth."

Since the addenda were expressly made a part of the specifications, and were returned by ARA to the city along with the specifications in the bid package by ARA, we find that ARA bound itself to comply with the fifth addendum.

ARA did submit a proper pro forma profit and loss projection for the first year, and the specifications do not unambiguously require that the extra 6,000 square feet be used as a dining room. The findings of the trial court in this regard are not supported by the evidence. We conclude that the ARA bid did conform to the specifications.

*Assignment of Error Number 4(F)*

"The contract award was not invalidated by ARA's communications to the City subsequent to bid opening.

"1. ARA's communications to the City were not attempts to amend its bid.

"2. Even if ARA's communications to the City subsequent to bid opening were attempts to amend, the great weight of authority in Ohio permits awarding a contract on the basis of an acceptable bid as it was originally submitted exclusive of any attempted amendments."

The ordinances of the city of Cleveland require that where real estate is to be leased or sold, the city shall advertise for bids "in the same manner as in the case of other purchases and sales." Section 183.06, Cleveland Codified Ordinances. The ordinances further require that the bids are to be opened at 12:00 noon on the last day for filing bids and "properly tabulated and summarized immediately after being read." Sections 181.21, 181.29, Cleveland Codified Ordinances. The Board of Control had the power to accept or reject bids or parts of bids, and to investigate and consider "the responsibility of the bidder." Sections 181.30, 181.31. The Board of Control does not have the authority to solicit modifications of bids.

The city did, however, solicit additional commitments from ARA Services after the bids were opened. In response to communications from city officials (Mr. Robinson, Miss Vodicka and Mr. Wheeler), ARA made the following promises:

(1) To retain all persons currently employed at the restaurant, on a seniority basis;

(2) To lower the price of a hamburger platter from $3.25 to $2.95; and

(3) To recognize the union representing the current employees.

The city officials were seeking to obtain a more favorable lease for the people of Cleveland by means of these post-bid communications with ARA Services. The purpose and effect of these actions by the city were to circumvent the orderly process of secret, competitive bidding. The informal procedure used by the city to upgrade the bids has several drawbacks. First, a bidder might be easily favored or disfavored, if the same requests are not made of each bidder, or if the responses are not accurately recorded. Second, a bidder probably would not have time at a post-bid conference to carefully evaluate and respond to the request of a municipal

official for an improvement to its bid. Third, a bidder's response to a request for a modification might be revealed to the other bidders before their responses are elicited. These concerns are ample justification for invalidating any bidding process wherein the municipality seeks modifications of bids which have been opened. The action of the city in the case at bar in seeking the aforementioned commitments constituted sufficient grounds for the court to nullify the entire bidding process and to enjoin the city and ARA Services from entering into the lease.

The Cleveland Codified Ordinances do contain one provision authorizing the city to contact a single bidder to obtain information on one particular subject; under Section 665.05, the "apparent successful bidder" may be required to submit an affirmative action program to the city's contract compliance officer. We find that Mr. Wheeler, the contract compliance officer, acted within the authority granted to him under Section 665.05 of the Codified Ordinances in eliciting promises from ARA Services that it would retain the current women and minority supervisors and that forty percent of its workforce would be comprised of individuals from minority groups. The trial court erred in finding that the bid of ARA Services could be invalidated because it submitted an affirmative action program. This assignment of error is well taken in part.

*Assignment of Error Number 4(G)*

"The procedures by the Board of Control were legal and proper.

"1. All required recommendations were submitted.

"2. The Board fully complied with its own By-Laws."

The trial court found that the Cleveland Board of Control acted without authority because it acted without the approval of the following three municipal officers and agencies: (1) the commissioner of the division of purchases and supplies; (2) the contract compliance officer in charge of affirmative action requirements; and (3) the city council.

Pursuant to Section 181.10 of the Codified Ordinances, the approval of the Commissioner of the Division of Purchases and Supplies is required for purchases exceeding $3,500; however, that ordinance does not require his approval for leases and leases by way of concession.

The record in the case at bar demonstrates that the contract compliance officer for the city of Cleveland approved the equal opportunity provisions of the ARA bid before the Board of Control acted on December 14, 1978.

Finally, neither the Charter nor the Ordinances of the city of Cleveland permit the city council to "approve" or "disapprove" a bid, once the bids have been submitted to the appropriate city agency. The only purported authority for this proposition is the following excerpt from Section 183.03 of the Ordinances:

"* * * The lease by way of concession shall recite the obligations of the lessee relating to the carrying forward of the public purpose for which the real estate is so leased, including the terms, conditions and requirements set forth in the proposed lease by way of concession as authorized and approved by ordinance of Council. * * *"

The ordinance merely grants the city council the power to initiate the bidding process by passing enabling legislation. This section does not give council veto power over a bid or set of bids. The power of council is limited to authorizing the administration to invite and receive bids. Once the administration has received and opened the bids, council may not withdraw its "approval" of the proposed lease. The appellants' argument is well taken.

*Assignment of Error Number 4(H)*

"The repeal of Ordinance No. 2251-75 did not affect the award to ARA or ARA's right to the concession."

As noted in the discussion to the im-

mediately preceding argument, the city council lacks authority to act once bids have been opened by the city. The Charter and Ordinances vest the power to award bids in the Board of Control, not the council. Council may initially authorize the taking of bids, and may establish terms, conditions and requirements of the proposed contract; but it may not affect the decision of the administration once bids have been opened. The action of the council in the case at bar in repealing the enabling ordinance is null and void.

### Fifth Assignment of Error

"Even if the above actions did constitute violations, they were at best de minimus and should not void an otherwise fair and integrious award procedure."

The material omissions from the original advertisement, the modification of the specifications to expand the facilities to be leased by forty percent, and the city's solicitation of improvements in the bids after the bids were submitted, were not *de minimus* violations. This argument is not well taken.

### Sixth Assignment of Error

"Appellants are entitled to a new trial because the record demonstrates that they did not receive a fair and impartial trial in the court below."

The appellants urge that they were denied a fair and impartial trial because the trial judge was prejudiced against them. There is authority in Ohio for reversing the decision of a trial court where it appears from the record that the judge was so biased that the appellant was denied a fair trial. In *State* v. *Lawrence* (1954), 162 Ohio St. 412 [55 O.O. 236], the Supreme Court reversed the conviction of a criminal defendant because the trial court repeatedly interrupted the direct examination of defense witnesses, to in-form them that he doubted their veracity and to threaten them with citations of perjury. In *Surgeon* v. *Surgeon* (1956), 165 Ohio St. 233 [59 O.O. 307], a divorce case, the trial court cross-examined the defendant-wife at length in a scathing and sarcastic manner. The Supreme Court ruled that she was denied a fair trial and reversed the decision of the trial court granting the husband a divorce.

The appellants have provided this court with numerous excerpts from the transcript of the proceedings below which they contend demonstrate the bias of the trial court. From our perspective, the trial court was unduly impatient,[9] but a careful review of the record has failed to convince this court that the appellants were deprived of a fair trial. This assignment of error is not well taken.

For the reasons set forth above we find the trial court's injunctive order of January 19, 1979, to be erroneous in part. The injunction granted on behalf of appellee Sky Chefs is modified to provide as follows:

### III
### Injunction

1. The city of Cleveland is hereby enjoined from entering into a lease by way of concession with any persons based upon the advertisement of July 5 and 12, 1978, and the bids opened October 6, 1978.

2. The city of Cleveland is hereby enjoined from engaging in any of the following practices in connection with the lease of city-owned property by way of concession:

(a) Omitting material terms, conditions, or requirements of the enabling ordinance from the advertisement for bids;

(b) Issuing material amendments to the specifications for the lease after

---

[9] The most inappropriate comment of the trial court was directed to the defendant Vodicka:

"Lady, when I am talking, you have to listen. That's one time you have to be quiet. You are the champion speaker that I have seen in six years." (T. 1455.)

potential bidders have obtained the specifications; and

(c) Soliciting additional and material commitments from bidders after bids have been opened, except as authorized by the city Charter and ordinances.

The injunctive order of the trial court on behalf of appellee Sky Chefs, is affirmed as modified.

*Judgment affirmed
as modified.*

PARRINO and KRUPANSKY, JJ., concur.