[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 590.]

DANIS CLARKCO LANDFILL COMPANY, APPELLEE AND CROSS-APPELLANT, *v.*

CLARK COUNTY SOLID WASTE MANAGEMENT DISTRICT, CROSS-APPELLEE;

OGDEN MARTIN SYSTEMS, INC., APPELLANT AND CROSS-APPELLEE.

[Cite as *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*,

1995-Ohio-301.]

*Counties—Solid waste management districts -- Selection of designated providers of solid waste disposal services not subject to competiitive bid requirements of R.C. 307.86—Procedure for selecting designated providers of solid waste disposal services—Issue of whether to grant or deny an injunction is solely within discretion of trial court.*

1.   The selection of designated providers of solid waste disposal services by a county solid waste management district established pursuant to R.C. Chapters 343 and 3734 does not involve the expenditure of public funds falling within the minimum monetary limits of the county competitive bid statute, R.C. 307.86, and such a selection is not subject to the competitive bid requirements of that statute.

2.   In selecting designated providers of solid waste disposal services,a county solid waste management district established pursuant to R.C. Chapters 343 and 3734 may adopt a procedure by which it first issues a request for proposals to be followed by subsequent negotiation with successful respondents.

3.   The issue whether to grant or deny an injunction is a matter solely within the discretion of the trial court and a reviewing court will not disturb the judgment of the trial court in the absence of a clear abuse of discretion. (*Garono v. State* [1988], 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498, followed.)

(No. 94-1047—Submitted May 23, 1995—Decided September 6, 1995.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Clark County, No. 3048.

---

{¶ 1} The Clark County Solid Waste Management District ("District") is a single county solid waste management district established pursuant to R.C. Chapters 343 and 3734, and is responsible pursuant to R.C. 3734.52 *et seq*., for preparing, obtaining Ohio Environmental Protection Agency approval for, and implementing a ten-year solid waste management plan ("SWM plan" or "plan") for disposal of solid wastes generated within the District's boundaries. In February 1992, the District received approval from the Director of the Ohio Environmental Protection Agency ("OEPA") for its SWM plan. The plan contemplated continued use of an existing landfill (the Tremont City Landfill) for disposal of wastes generated in Clark County until that landfill reached its capacity, expected to occur in late 1992 to early 1993. Thereafter the plan contemplated both interim and long-term disposal systems. The plan called for interim waste disposal needs to be met by transfer of solid waste to an unspecified transfer station and landfill which the District intended to identify through a request for proposals ("RFP") process. Pursuant to that process, the District intended to solicit proposals from private solid waste operators, to select the proposal it deemed most satisfactory and beneficial to the residents of the District, and to thereafter enter into negotiations with the successful operator leading to execution of a contract. In terms of long-term (fifteen-twenty years) solid waste planning, the approved plan again contemplated use of an RFP-negotiation process to obtain future disposal or landfill services for the use of both residential and industrial waste generators in the district.

{¶ 2} The District's OEPA-approved plan defined "secondary processing facilities" as including composting systems, waste-to-energy facilities, refuse-derived fuel facilities and other secondary recycling and composting methods. Although the plan did not schedule development of a waste-to-energy incinerator or other secondary processing facility, or anticipate implementation of such a facility for eight to ten years, the plan indicated the District's intent to use the RFP process to "accept

secondary processing facility alternatives to determine improved cost competitiveness due to local private sector involvement."

{¶ 3} Accordingly, in early 1992, the District issued a formal document of over two hundred pages entitled "Request for Proposal for an Integrated Solid Waste Management System." The RFP sought "proposals from qualified bidders to design, construct and operate solid waste management facilities for the benefit of the District and its Residents," and indicated the District's willingness to accept proposals as to the following enumerated types of solid waste facilities: (1) a material processing facility to provide a drop-off station at which trash could be sorted and directed towards further disposal, (2) a yard waste composting facility, (3) a solid waste transfer station, and (4) a newly constructed landfill with minimum eleven-year disposal capacity. In addition, bidders were invited to suggest in their proposals options as to "secondary processing technologies to reduce disposal capacity requirements," and were advised that "secondary processing alternatives proposed as part of a total solid waste management solution [would] be considered." The RFP further apprised potential respondents that the District did not "currently anticipate that a secondary processing technology would be cost-effective within the District within the 11-year planning period," but that it was "possible that one of many secondary processes will be feasible during the 11-to-21-year term of the proposed contract."

{¶ 4} The RFP indicated the basic process by which sealed bids for "Comprehensive Solid Waste Management Services" would be received and opened, and by which they could be withdrawn, and included the following statement:

"The District shall have the right to reject any or all Bids, waive any and all informalities or irregularities in any Bid or in the bidding, to accept any Bid which is deemed most favorable to the District, and to negotiate contract terms with the successful Bidder."

**{¶ 5}** The RFP set forth the District's criteria to be used in evaluating bids, and reserved for the District the right to consider qualifications and experience of bidders, their key personnel and facility supervisors in managing solid waste facilities. The District informed prospective respondents that it might "schedule interviews with any or all of the Bidders," and that the results of those interviews would be "incorporated into the District's qualitative evaluation of the Bidder and its Bid." As to bids including proposals for secondary processing technologies, the District informed bidders that it reserved the right to "select any alternate Bid, or part thereof, if the District believes it is in the best interest of the District and its Residents" and advised bidders in general of its intent to reserve the right to "accept any component of any bid."

**{¶ 6}** The RFP included sample contractual agreements which represented "the most likely options of the District," although potential respondents were informed that "[o]ther eventualities, unique solid waste services, and Bidder requirements may require separate negotiation between the Bidder and the District." The sample contract documents contemplated that a successful private operator would site, design, construct and operate its proposed waste disposal facilities at the operator's sole cost, all in accordance with the proposal set forth in its bid, subject to modifications resulting from negotiations due to changes in the law or regulations. Pursuant to the expected contracts, the selected private operators would accept for processing and disposal all of the solid wastes (according to enumerated types, *e.g.*, yard waste, recyclables and mixed waste) generated by residents of the District for a specified term, and to grant the District, on behalf of its residents (including all residential households; all commercial, industrial or agricultural enterprises; and all governmental entities) an irrevocable license to use its private facility for solid waste disposal purposes. In exchange, the sample contracts called for the District to "designate the Facility as the facility where all Solid Waste and Recyclable Materials generated in the District, and over which the District has designation authority, is to

be delivered and processed," and to refuse to so designate any other facility for those purposes. In further consideration of receiving such a designation, the successful bidder would contractually agree to charge depositors a pre-specified price per ton ("tip fee") set by the contract, and would pay the District a royalty fee based on the tonnage of trash received.

{¶ 7} The District received at least ten proposals in response to the RFP, including proposals submitted by Danis Clarkco Landfill Company ("Danis") and Ogden Martin Systems, Inc. ("OM"), parties herein.

{¶ 8} Of the bids received, only OM proposed a secondary processing technology. OM proposed a joint project with Ohio Edison in which an existing Ohio Edison facility in Clark County would be converted into a mass-burn incineration facility producing electricity from the burning of refuse. OM proposed to enter into a twenty-five-year contract by which the District would designate it to be the disposal provider of Clark County's solid waste with an expected "tip fee" of $43.60 per ton upon completion of the facility.

{¶ 9} Danis's bid contemplated the construction of a new landfill adjacent to the existing Tremont City Landfill, which it owned and operated. Danis sought a contract by which the District would deem the new Danis facility to be the designated provider of solid waste disposal services in Clark County for a minimum of thirty years, and proposed a tip fee of $34.13 per ton for disposal into the newly constructed landfill once built.

{¶ 10} On September 8, 1992 the District's Board of Directors adopted separate resolutions giving notice of the District's intent to award three contracts, including a contract by which OM and Ohio Edison would be designated to provide long-term solid waste disposal services by means of their proposed incineration facility. Each resolution noted that the award was subject to development and execution of a written contract within ninety days, successful completion of siting as

required by the District's approved SWM plan, and issuance of all required OEPA or other governmental permits.

{¶ 11} On October 30, 1992 Danis filed a complaint in the Court of Common Pleas of Clark County, naming the District as defendant, in which Danis claimed that its bid was the only proposed bid which complied with the director-approved District SWM plan, as only the Danis bid contemplated construction of a new sanitary landfill. Danis sought a declaratory judgment claiming that the District lacked statutory authority to enter into a contract with OM, in that the OM bid did not comply with the plan and thus was not a conforming bid. Danis sought temporary, preliminary and permanent injunctive relief in the form of an order, *inter alia:* (1) enjoining the District from entering into contracts with OM for incineration services, and (2) ordering the District to execute a contract with Danis for provision of solid waste management services. Danis further claimed that the District was required to accept its bid, contending that the Danis bid represented the sole, hence lowest, bid which conformed to the OEPA-approved plan. The parties thereafter stipulated, with the court's concurrence, that OM should be permitted to intervene as an additional defendant.

{¶ 12} The trial court held an evidentiary hearing after which it denied Danis preliminary injunctive relief based on its finding that Danis was not likely to prevail on the merits under any of its three proffered legal theories. The court held that (1) determinations of compliance or non-compliance with the District's Plan (such as whether designation of the OM-Ohio Edison waste-to-energy incinerator violated the SWM Plan) are properly determined by the Director of Environmental Protection ("Director") pursuant to the doctrines of exhaustion of administrative remedies and primary administrative jurisdiction, (2) Danis had not demonstrated evidence sufficient to show that the District had abused its discretion by fraudulently conspiring against Danis to prevent it from being awarded a contract, and (3) Danis had not demonstrated that the award of a contract to OM would violate R.C. 307.86, Ohio's competitive bid statute applicable to counties.

{¶ 13} The parties stipulated, with the concurrence of the trial court, that the preliminary injunction hearing should be deemed consolidated with trial on the merits.

{¶ 14} The court of appeals reversed in part, and ordered that injunctive relief be granted by the trial court to prevent the District from awarding a contract to OM. The court of appeals agreed that claims of plan violations should be brought first to the Director, but held that the Director had no authority nor primary jurisdiction to adjudicate Danis's claims that Ohio competitive bid statutes were violated. The appellate court held R.C. 307.86 to be inapplicable according to its terms, but held that the District had nevertheless voluntarily committed itself to a competitive bidding process, had thereby become subject to statutory competitive bid principles, and was thus required to make its award to the "lowest and best" bidder. It held that Danis was entitled to relief, in that the District had violated its own rules of bidding, and had failed to consider Danis's bid in good faith. It remanded the cause to the court of common pleas, which granted injunctive relief in accordance with the opinion of the court of appeals.

{¶ 15} The cause is now before this court pursuant to the allowance of a discretionary appeal and cross-appeal.

_____

*Faruki, Gilliam & Ireland*, *Charles J. Faruki* and *Jeffrey T. Cox*, for appellee and cross-appellant.

*Eastman & Smith, John D. Willey, Jr.,* and *Kenneth C. Baker; Stephen A. Schumaker*, Clark County Prosecuting Attorney, and *Thomas E. Trempe*, Assistant Prosecuting Attorney, for cross-appellee Clark County Solid Waste Management District.

*Benesch, Friedlander, Coplan & Aronoff, N. Victor Goodman, James F. DeLeone, Terrence M. Fay* and *Mark D. Tucker*, for appellant and cross-appellee, Ogden Martin Systems, Inc.

*Smith & West* and *William D. West*, urging reversal on appeal for *amicus curiae*, CF/Water.

*David L. Feltner* and *Linda R. Evers*, urging reversal on appeal for *amicus curiae*, Ohio Edison Co.

*Gallon & Takacs* and *Jeffrey Julius*, urging reversal on appeal for *amici curiae*, Ohio State Building and Construction Trades Council and Dayton Building and Construction Trades Council.

_____

**MOYER, C.J.**

{¶ 16} In this case a county solid waste management district solicited proposals for construction of a solid waste disposal facility from private enterprises, in contemplation of thereafter negotiating and entering into a contract pursuant to which the successful bidders would agree to implement their proposals in consideration of the district designating them to be the sole legal recipients of all solid waste of enumerated types generated within the District. The primary legal issue we are called upon to resolve is whether Ohio's competitive bidding law applicable to counties, as set forth in R.C. 307.86 *et seq.*, bars a county solid waste management district from selecting providers of solid waste disposal through the use of an RFP-negotiation process.

{¶ 17} We resolve this inquiry in the negative, as did the court of appeals. We further agree with the court of appeals that the District is under a legal obligation to deal in good faith with bidders participating in its RFP process and must comply with the terms and obligations it set forth in its RFP document. The court of appeals erred, however, in holding that the District had voluntarily committed itself to strictly follow all provisions of Ohio's competitive bid statutes as interpreted by case law, and further erred in reversing the trial court's holding that Danis had failed to prove fraud or bad faith on the part of the District. We therefore remand this cause with instructions that

the injunction entered in compliance with the judgment of the court of appeals be vacated.

*Solid Waste Disposal Statutory Framework*

{¶ 18} Effective June 24, 1988, the General Assembly enacted Am.Sub.H.B.No. 592 ("H.B. 592") (142 Ohio Laws, Part III, 4418), thereafter codified in, *inter alia*, R.C. Chapters 343 and 3734.  H.B. 592 constituted comprehensive legislation establishing statewide solid and hazardous waste management policies and programs.  It vested the Director of Environmental Protection with wide ranging authority to adopt rules governing solid waste facilities and mandated each county to either create a county solid waste management district ("SWM district") or participate in a joint county solid waste management district. Where a county SWM district is created, as in the case *sub judice*, the members of the county board of commissioners also serve as members of the board of directors of the SWM district.  R.C. 3734.52(A).  Each county SWM district is required to prepare and implement a ten-year county solid waste management plan which must be submitted to and approved by the Director.  R.C. 3734.54(A).  Thereafter, each district is responsible for implementing the plan in compliance with schedules contained in the approved plan.  R.C. 3734.55(C)(4).  In the event that a SWM district materially fails to implement its approved plan, the Director must issue an enforcement order directing the district to comply with the implementation schedule in the plan within a specified reasonable time.  R.C. 3734.13(A) and 3734.55(E).  Where such an order is disregarded, the Director may request the Attorney General to bring a civil action for appropriate relief, including a temporary restraining order, preliminary or permanent injunction and civil penalties.  R.C. 3734.13(C).

{¶ 19} In addition, the statutory framework provides a method of private enforcement by which any person aggrieved or adversely affected by an alleged violation of R.C. Chapter 3734, including violations of approved SWM plans, may commence a legal action in the court of common pleas in the county where the alleged

violation occurred. R.C. 3734.101(A) and (E). Such an action is contingent, however, upon the potential plaintiff first giving the Director one hundred fifty days' written notice of the alleged violation, during which time the Director is authorized to issue an enforcement order. In the event the Director issues an enforcement order within the one-hundred-fifty-day period, the contemplated private action is barred. R.C. 3734.101(B) and (C)(1).

{¶ 20} H.B. 592 contemplated the inclusion of "flow-control provisions" in district SWM plans by which each district must "designate" the facility or facilities to which wastes generated within its boundaries must be taken. Such a designation is of value to solid waste disposal providers in that it ensures the receipt of a steady stream of solid waste, and thus guarantees the designated provider a stable revenue source. The legislation expressly prohibited the delivery of any solid wastes generated within a county to any facility other than those designated in the county's SWM plan, providing, "[n]o person, municipal corporation, township, or other political subdivision shall deliver, or cause the delivery of, any solid wastes generated within a county or joint district to any solid waste transfer, disposal, recycling, or resource recovery facility other than the facility designated in the solid waste management plan or amended plan of the district approved under section 3734.55 or 3734.56 of the Revised Code." Former R.C. 343.01(H)(2).[1] In addition, a SWM district is statutorily authorized to enter into contracts with private waste disposal service providers "for the furnishing to the district *** of solid waste collection, storage, transfer, disposal, recycling, processing, or resource recovery services." R.C. 343.02. The relevant

---

1. In 1993, R.C. 343.01(H)(2) was renumbered (I)(2) (144 Ohio Laws, Part IV, 6259-6260), and later that year amended to state that, where a facility designation has been made by an SWM district in accordance with an approved plan, "no person *** shall deliver *** solid wastes generated within a county or joint district to any solid waste *** facility *other than the facility [so] designated in* [newly enacted] *section 343.013, 343.014 or 343.015 of the Revised Code, or* in the initial or amended plan of the district prepared and ordered to be implemented under section 3734.521, 3734.55 or 3734.56 of the Revised Code, as applicable." (Emphasis added.) Am. Sub. S.B. No. 153, 145 Ohio Laws ___.

statutes in R.C. Chapter 343 are silent regarding the issue of whether such contracts and designations are subject to statutory competitive bidding requirements.

*Alleged Mootness*

{¶ 21} Danis contends that this action should be dismissed as moot in light of the decision of the Supreme Court of the United States in *C & A Carbone, Inc. v. Clarkstown* (1994), 511 U.S. ___, 114 S. Ct. 1677, 128 L.Ed.2d 399. In *Carbone* the court invalidated a flow-control ordinance enacted by the town of Clarkstown, New York, as violative of the Commerce Clause of Section 8, Article I of the United States Constitution. Danis argues that R.C. 343.01(I)(2), formerly (H)(2), which authorizes SWM districts to adopt exclusive flow-control designations, is similarly unconstitutional. In effect, Danis argues that the appeal is moot in that, in light of *Carbone*, the District will be unable to legally comply with future contractual obligations to enforce a designation of the proposed OM-Ohio Edison incinerator as the sole repository of non-compostable, non-recyclable solid wastes generated within the District.

{¶ 22} Initially, it may be noted that an injunction precluding execution of any contract between the District and OM has been issued by the common pleas court. So long as that injunction remains in effect, a real, justiciable controversy exists between the parties which is neither merely academic nor abstract. See *State ex rel. Eliza Jennings, Inc. v. Noble* (1990), 49 Ohio St.3d 71, 74, 551 N.E.2d 128, 131, citing *Miner v. Witt* (1910), 82 Ohio St. 237, 238-239, 92 N.E. 21, 22.

{¶ 23} Secondly, we note that Danis did not raise constitutional issues concerning the District's actions in the courts below, and we therefore deem any constitutional objections it might have raised based on the Commerce Clause of the United States Constitution to have been waived.

{¶ 24} Thirdly, acceptance of Danis's argument would result in an implicit finding by this court that the Clark County Solid Waste Management District could adopt *no* designation or flow-control resolution consistent with the Commerce Clause.

It would be inappropriate for this court to make such an anticipatory ruling, particularly in light of long-established precedent that counties and municipalities may, within the exercise of their police power, designate approved facilities for disposal of solid waste to ensure the public health, *cf. Peninsula Sanitation, Inc. v. Manistique* (1994), 208 Mich. App. 34, 526 N.W.2d 607, and in light of the possibility that at some future time *Carbone* may be legislatively overruled by Congressional action. See *Carbone*, 511 U.S. ____, 114 S.Ct. at 1692, 128 L.Ed.2d at 420 (O'Connor, J., Concurring).

**{¶ 25}** Finally, even where appeals to this court might be deemed technically moot, this court may nevertheless hear them where, as here, the appeal contains issues of great public or general interest. *Franchise Developers, Inc. v. Cincinnati* (1987), 30 Ohio St.3d 28, 30 OBR 33, 505 N.E.2d 966.

**{¶ 26}** For all the foregoing reasons we do not deem this appeal to be moot.

**{¶ 27}** We further reject the argument that R.C. 343.014(J) effective October 29, 1993 (145 Ohio Laws ___), precludes review of this case.

*Exhaustion of Administrative Remedies*

**{¶ 28}** The trial court refrained from adjudicating Danis's contentions that the District's actions violated the technical requirements of R.C. Chapter 3734 based on its finding that Danis failed to exhaust administrative remedies available to it under R.C. Chapters 3734 and 3745.[2] The court of appeals affirmed, and Danis has in this court expressly disclaimed any challenge to these lower court findings.

---

2. R.C. 3734.101 at the time this action was commenced, provided in relevant part:

"(A) Except as provided in division (C) of this section, any person aggrieved or adversely affected by an alleged violation of this chapter or a rule, permit, license, variance, or order issued or adopted under it may commence a civil action on his own behalf against any person, the state, or a political subdivision that is alleged to be in violation of this chapter or a rule, permit, license, variance, or order issued or adopted under them. ***

"(B) An action under division (A) of this section may be commenced no sooner than one hundred fifty days after the aggrieved or adversely affected person has given notice of the alleged violation to the director of environmental protection, the attorney general, and the alleged violator. Notice required under this division shall be delivered by certified mail and shall describe in detail the alleged violation for which the action may be commenced.

**{¶ 29}** We concur, and hold that Danis's failure to exhaust administrative remedies and failure to serve a one-hundred-fifty-day notice on the Director as required by R.C. 3734.101 barred it from commencing suit in the common pleas court alleging failure of the District to comply with the requirements of its approved plan. See *State ex rel. Brown v. Rockside Reclamation, Inc.* (1976), 47 Ohio St.2d 76, 84, 1 O.O. 3d 46, 50, 351 N.E.2d 448, 453-454. Accord *Empire Sanitary Landfill v. Pennsylvania Dept. of Environmental Resources* (1994), 165 Pa. Commw. 442, 447-448, 645 A.2d 413, 415.

**{¶ 30}** We therefore refuse to consider on this review any allegations of illegality based on the District's alleged failure to act in accordance with its own ten-year OEPA-approved plan.

---

"(C)(1) No action may be commenced under division (A) of this section if, within one hundred fifty days after the aggrieved or adversely affected person has given notice under division (B) of this section:

"(a) The director, with the written concurrence of the attorney general, has issued an administrative enforcement order requiring compliance by the alleged violator with the particular provision of this chapter, rule, permit, license, variance, or order in question; or

"(b) The attorney general, prosecuting attorney of a county, or city director of law is prosecuting a civil or criminal action in any court to require compliance by the alleged violator with the particular provision of this chapter, rule, permit, license, variance, or order in question." (142 Ohio Laws, Part III, 4495-4496.) (Amended effective October 29, 1993 in 145 Ohio Laws ___.)

R.C. 3745.08 as in effect when this action was commenced, provided, in part:

"(A) *** [A]ny person who is or will be aggrieved or adversely affected by a violation which has occurred, is occurring, or will occur may file a [verified] complaint, *** with the director of environmental protection, in accordance with the rules of the director adopted pursuant to Chapter 119. of the Revised Code, alleging that another person has violated, is violating, or will violate any law, rule, standard, or order relating to *** solid waste, *** or, if the person is in possession of a valid *** plan approval relating to *** solid waste, that the person has violated, is violating, or will violate the conditions of the *** plan approval. ***

"(B) Upon receipt of a complaint authorized by this section, the director shall cause a prompt investigation to be conducted such as is reasonably necessary to determine whether a violation, as alleged, has occurred, is occurring, or will occur. The investigation shall include a discussion of the complaint with the alleged violator. If, upon completion of the investigation, the director determines that a violation, as alleged, has occurred, is occurring, or will occur, he may enter such order as may be necessary, request the attorney general to commence appropriate legal proceedings, or, where he determines that prior violations have been terminated and that future violations of the same kind are unlikely to occur, he may dismiss the complaint. *** " (143 Ohio Laws, Part III, 4684-4685.) (Amended effective July 1, 1995, in 145 Ohio Laws ___.)

**{¶ 31}** We similarly reject OM's contention that the doctrine of primary administrative jurisdiction precludes this court from resolving the competitive bid issues Danis has presented pending final resolution of administrative appeals. In this case, although Danis did not pursue administrative remedies, the parties and the court of appeals all have acknowledged that persons not parties to the instant cause did pursue administrative challenges with the Director of Environmental Protection concerning the District's proposed selection of the OM incinerator proposal, and that litigation resulting from that challenge continues at the time of the issuance of this opinion. We confine our review to substantive legal issues not falling within the administrative purview of the OEPA.

*Purported Applicability of Competitive Bidding Statute*

**{¶ 32}** The court of appeals in this case recognized that "[n]egotiating material aspects of contracts after the bid opening is violative of the sanctity and integrity of competitive bidding." Review of the District's RFP makes it clear that the District chose a process which can only in the most general sense be deemed to be "competitive bidding." See *Yellow Cab of Cleveland, Inc. v. Greater Cleveland Regional Transit Auth.* (1991), 72 Ohio App.3d 558, 561, 595 N.E.2d 508, 509 ("'[T]he RFP method of procurement is not competitive bidding.'") Certainly, the RFP process did not contemplate the execution of a contract based upon a simple acceptance by the District of the successful bidder's original proposal. Rather, the RFP contemplated an award solely of the opportunity to *further* negotiate to reach a possible contract with the District. The RFP did not include architectural or engineering plans or "specifications" as that term is generally used in competitive bid law in the sense of reasonably definite required elements. See Black's Law Dictionary (6 Ed.1990) 1399 ("specification," as used in the law relating to construction contracts, defined as "a *particular or detailed statement* *** of the various elements, materials, dimensions, etc. involved"). (Emphasis added.) Accord *Thelander v. Cleveland* (1981), 3 Ohio App.3d 86, 99, 3 OBR 100, 114, 444 N.E.2d 414, 427 (where

competitive bidding required, alteration of specifications without readvertisement and recommencement of the bidding process constitutes abuse of discretion by public officials).  See, also, R.C. 307.02(D), requiring counties to devise "[*d]efinite and complete* specifications of the work to be performed, together with such directions as will enable a competent mechanic or other builder to carry them out" in procuring leased building spaces.  (Emphasis added.)  Competitive bidding is based on the premise that submitted proposals will be susceptible to being judged as "apples against apples."

{¶ 33} However, the RFP proposal used in this case, in soliciting proposals for a wide range of innovative waste disposal methodologies and technologies, resulted in the District receiving proposals for entirely different kinds of solid waste disposal facilities at entirely different locations, necessarily requiring the District to judge the proposals by a nonexistent standard.

{¶ 34} The issue, then, is whether the District could legally choose this method to meet its statutory duty to designate waste disposal facilities.  We start with the premise that a public entity is not required to engage in competitive bidding in the absence of legislation requiring it.  *Shafer v. Streicher* (1922), 105 Ohio St. 528, 534, 138 N.E. 65, 67.  Danis has contended throughout the course of this litigation that the District falls within the scope of R.C. 307.86, which provided at the time this action was commenced:

"Anything to be purchased, leased, leased with an option or agreement to purchase, or constructed, including, but not limited to, any product, structure, construction, reconstruction, improvement, maintenance, repair, or service, except the services of an accountant, architect, attorney at law, physician, professional engineer, construction project manager, consultant, surveyor, or appraiser by or on behalf of the county or contracting authority, as defined in section 307.92 of the Revised Code, *at a cost in excess of ten thousand dollars*, except as otherwise provided ***, shall be

obtained through competitive bidding.  \*\*\*" (Emphasis added.)  (144 Ohio Laws, Part II, 3261.)[3]

{¶ 35} In this case, a bidder responding to the District's RFP sought to enter into a contract by which it would receive a "designation" in exchange for its agreement to build and operate a waste disposal facility for the use of residents of the District. The anticipated contract quite simply did not involve *any* monetary cost to the public or expenditure of public funds by the District.  As then in effect, R.C. 307.92 applied only to contracts "at a cost in excess of ten thousand dollars," and the court of appeals correctly held that the proposed contracts contemplated by the RFP process did not fall within the scope of the statute.

{¶ 36} Danis urges this court to look to the value of the contemplated facility in determining whether the proposed contract meets the statutory monetary minimums of R.C. 307.86.  The contemplated OM-Ohio Edison incinerator facility here at issue was estimated to be a $150 million construction project with an ultimate projected economic benefit to the community as high as $450 million.  We acknowledge that among the purposes of competitive bidding legislation are the protection of the taxpayer; prevention of excessive costs and corrupt practices; and the assurance of open and honest competition in bidding for public contracts so as to save the public harmless, as well as bidders themselves, from any kind of favoritism, fraud or collusion.  *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 21, 552 N.E.2d 204; *Boger Contracting Corp. v. Bd. of Commrs. of Stark Cty.* (1978), 60 Ohio App.2d 195, 14 O.O. 3d 176, 396 N.E.2d 1059; *United States Constructors & Consultants, Inc. v. Cuyahoga Metro. Hous. Auth.* (1973), 35 Ohio App.2d 159, 163, 64 O.O.2d 267, 269, 300 N.E.2d 452, 454.  We further acknowledge that the power entrusted to SWM districts to designate exclusive of solid waste disposal providers

---

3. R.C. 307.86 contains numerous exceptions to the general requirement of county competitive bidding of contracts in excess of the monetary minimums.  None of those exceptions has, however, been asserted to be applicable to the cause *sub judice*.)

vests those districts with the power to "award" projects potentially worth millions to the parties they select. Danis argues that a contract for exclusive services awarded by a public entity *should* be subject to the checks and balances afforded by competitive bidding.

{¶ 37} While this argument is not without some appeal, we conclude that the General Assembly has not enacted a competitive bidding requirement that reaches designations of privately owned and operated solid waste disposal facilities. It has instead chosen alternative methods by which to protect the public interest, *i.e*., by vesting the Ohio Environmental Protection Agency with extensive supervisory authority over both solid waste providers and solid waste management districts, and by including assurances in the statutory scheme that the public will have ample opportunity to become involved in the process by which districts make solid waste disposal decisions, including facility designations. See, *e.g*., R.C. 343.014, which statutorily requires SWM districts to provide opportunity for public input as to facility designations. Although that statute had not yet been enacted at the time of the events *sub judice*, the District nevertheless held public hearings following the opening of the bids submitted in response to the RFP at which members of the public had the opportunity to respond, comment and ask questions concerning the various proposals. One of the advertised public hearings attracted between seventy-five and one hundred citizens.

{¶ 38} It is also true that the county itself may be presumed to be a future waste generator which will ultimately be required, as all residents of the District will be, to deposit future wastes at the designated facilities selected by the District, and to pay associated tip fees at that time. This fact does not, however, bring the designation selection process within the monetary minimums of R.C. 307.86. Any future tip fees to be paid by the county will be payments made in consideration of OM's receipt of wastes at that future time, and not in consideration of the District's *designation* of the OM-Ohio Edison facility as the sole repository of the identified types of solid wastes.

**{¶ 39}** Since we hold that the statutory minimum monetary expenditure requirement of R.C. 307.86 is not met by a county solid waste management district's designation process, we need not determine whether such a district constitutes a county "contracting authority" as defined in R.C. 307.92. Cf. 1992 Ohio Atty. Gen. Op. No. 92-060, at 2-246 to 2-247.

**{¶ 40}** We thus hold that the selection of designated providers of solid waste disposal services by a county solid waste management district established pursuant to R.C. Chapters 343 and 3734 does not involve the expenditure of public funds falling within the minimum monetary limits of the county competitive bid statute, R.C. 307.86, and such a selection is not subject to the competitive bid requirements of that statute. We further hold that, in selecting designated providers of solid waste disposal services, a county solid waste management district established pursuant to R.C. Chapters 343 and 3734 may adopt a procedure by which it first issues a request for proposals to be followed by subsequent negotiation with successful respondents.

*Limitation on Exercise of District Discretion*

**{¶ 41}** The District here chose to incorporate into its RFP negotiation process several components also required by statutory competitive bidding, *e.g*., sealed bids, bid bonds, performance bonds, public opening of bids. The court of appeals correctly recognized that the District was bound to adhere to these provisions, as well as other conditions and provisions it had itself set forth in the RFP, as a public authority or administrative agency may by its actions commit itself to follow rules it has itself established, including rules governing the evaluation of proposals where statutory competitive bidding is not required. Accord *Waste Mgt., Inc. v. Wisconsin Solid Waste Recycling Auth.* (1978), 84 Wis.2d 462, 477, 267 N.W.2d 659, 667, at fn. 4 (although not subject to competitive bid statutes, award of contract for design, construction and operation of a solid waste recycling facility was governed by proposal-negotiation rules set forth in RFP).

**{¶ 42}** The court erred, however, in extrapolating from that premise the conclusion that the District was bound to the full panoply of statutory competitive bid requirements set forth in R.C. Chapter 307. To the contrary, the District was bound only by the provisions contained within the RFP itself, and in its RFP the District reserved for itself the right to "waive any and all informalities or irregularities in any Bid ***." The District did not commit itself to accept the "lowest and best" proposal but, rather, informed bidders that it would accept the proposal, "or part thereof," it deemed to be "in the best interest of the District and its Residents."

**{¶ 43}** Whether or not these reservations of rights are consistent with the statutory competitive bidding requirements of R.C. 307.86 is irrelevant. Cf. *State ex rel. Coleman v. Munger* (1948), 84 Ohio App. 148, 152-153, 39 O.O. 170, 172, 83 N.E.2d 809, 811. Quite simply, the District was bound to follow the conditions it had set for itself in the RFP document, but was not required to follow the requirements of R.C. Chapter 307. The court of appeals thus erred in finding it impermissible for the District to, *e.g.*, allow OM to "waive" a "put-or-pay" provision in its bid based on its finding that the waiver constituted a "material" or "substantial" variation from the original OM proposal.[4]

*Propriety of Granting Injunctive Relief*

**{¶ 44}** Courts should take "particular caution *** in granting injunctions, especially in cases affecting a public interest where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government." *Leaseway Distrib. Centers, Inc. v. Dept. of Adm. Serv.* (1988), 49 Ohio App.3d 99, 106, 550 N.E.2d 955, 962; *Dandino v. Hoover* (1994), 70 Ohio St.3d 506, 639 N.E.2d 767. The issue whether to grant or deny an injunction is

---

4. A "put or pay" provision may be described as a provision by which an SWM district agrees to compensate a solid waste disposal provider in the event that prescribed levels of anticipated waste do not eventuate, thereby reducing the provider's expected revenues. An example of such a provision is described in *Carbone*, *supra*, 511 U.S. at --, 114 S.Ct. at1693, 128 L.Ed.2d at 421.

a matter solely within the discretion of the trial court and a reviewing court should not disturb the judgment of the trial court in the absence of a clear abuse of discretion. *Garono v. State* (1988), 37 Ohio St.3d 171, 173, 524 N.E.2d 496, 498.

{¶ 45} The court of appeals found that Danis was entitled to injunctive relief in that it had submitted evidence sufficient to prove bad faith on the part of the District and in that the District had "conducted a fraudulent bidding procedure by having implicitly represented that it would consider all responsive bids in good faith when it had no intention of considering Danis's bid in good faith." We reverse this holding. We find instead, that the record before the trial court justified a finding that the District substantially complied with the procedures it had announced in its RFP. When an award decision is based upon criteria expressly set forth in a bidding proposal, no abuse of discretion occurs. *Kokosing Constr. Co. v. Dixon* (1991), 72 Ohio App.3d 320, 325, 594 N.E.2d 675, 678.

{¶ 46} It is true that Danis presented evidence that one District board member had indicated he would "help lead the fight against Danis," and that prior to the date set for submission of proposals another board member had written a handwritten note indicating that the District "must follow the procedures & preserve [the District's] ability to oppose Danis in the future." The record shows that public opposition to Danis existed within Clark County based on its record of performance in operating the Tremont City Landfill, although the parties disagree as to the extent of that opposition. It is clear that the members of the District's board may have been influenced by citizens opposed to the selection of Danis's proposal, and may well have held a predisposition against accepting its proposal. However, such a reluctance under the circumstances of this case does not necessarily demonstrate bad faith or abuse of discretion.

{¶ 47} The District argued in the court below that its selection of the OM-Ohio Edison proposal was based on its determination that the proposal would meet ecological and economic needs not addressed by the Danis proposal, which

20

contemplated reliance on landfilling only. Testimony at the hearing established that the OM proposal was favored by one District board member based on his conclusion that (1) it was price competitive, (2) the technology "would serve the community well," (3) the proposal resulted in waste reduction, and (4) the District would be benefited by the generation of electricity by the facility. The vote of the District board was unanimous in favor of the OM-Ohio Edison proposal. The trial court correctly refrained from substituting its discretion for that of the District as to which submitted proposals would be "in the best interest of the District," a primary selection criterion established in the RFP.

{¶ 48} We further acknowledge that the District failed to interview Danis concerning its proposal, while choosing to interview several other respondents, including OM. Danis had, however, been interviewed previously by District representatives in connection with a similar proposal it had submitted in response to an earlier RFP, and the District was aware of the quality of Danis's operation of the contemporaneously operating Tremont City Landfill. The RFP clearly authorized the consideration of a bidder's past record of performance in evaluation of its bid. In addition, all submitted proposals, including that submitted by Danis, were evaluated by the primary review committee, and its summary of the Danis proposal was included in the Committee report to the District board. Danis was fully advised by the RFP regarding the procedures the District would follow in making its designation selection.

{¶ 49} To establish fraud or abuse of discretion Danis was required to prove that the District acted in bad faith or with an unreasonable, arbitrary or unconscionable attitude. *Cedar Bay Constr., supra*, 50 Ohio St.3d 21-22, 552 N.E.2d at 205. The trial court's finding that Danis failed to meet that burden of proof is not against the manifest weight of the evidence.

{¶ 50} In sum, we conclude that the court of appeals erred in holding that the District failed to adhere to any duty required of it, or otherwise abused its discretion. In the absence of such a finding, Danis was not entitled to injunctive relief. We

therefore reverse the judgment of the court of appeals, and reinstate the original judgment of the trial court.

*Judgment reversed*
*and original judgment*
*of the trial court reinstated.*

DOUGLAS, WALSH, RESNICK, F.E. SWEENEY and COOK, JJ., concur.

PFEIFER, J., dissents.

JAMES E. WALSH, J., of the Twelfth Appellate District, sitting for WRIGHT, J.

_____

**PFEIFER, J., dissenting.**

The math in this case adds up. The construction of this facility will cost over $150 million; there are approximately 148,000 citizens in Clark County. As I calculate it, this disposal plant will cost over $1,000 for every man, woman and child in the county, yet the majority holds that the awarding of this lucrative contract is exempt from competitive bidding.

The public's funds are public funds. Whether they are spent directly or indirectly by elected officials is of no consequence for purposes of Ohio's county competitive bidding statute, R.C. 307.86. The majority curiously labels the contract between the Clark County Solid Waste Management District ("District") and Ogden Martin Systems, Inc. ("OM") as a "designation," rather than an expenditure, in order to circumvent the requirements of R.C. 307.86. The majority contends that the "anticipated contract quite simply did not involve <u>any</u> monetary cost to, or expenditure of, public funds by the District." (Emphasis <u>sic</u>.) If there is any purpose to a public bidding statute, the logical and inescapable conclusion must be that when a solid waste management district obligates the citizens it represents to expend $150 million, the transaction is subject to the requirements of R.C. 307.86.

The "designation" of funds by the District falls within the purview of R.C. 307.86. R.C. 307.86 requires services purchased on behalf of a county or

22

contracting authority in excess of $10,000 to be obtained through competitive bidding.  The contract between the District and OM "designated" OM as the exclusive provider of solid waste disposal for a period of twenty-five years, during which time OM was to charge a pre-specified "tip fee" of $43.60 per ton. Waste estimates for Clark County indicate that the residential, industrial, and commercial sectors generate tens of thousands of tons of solid waste requiring disposal each year.  Thus, although the District did not directly convey any public funds, the District arranged for OM to receive the benefit of millions of dollars of the public's funds.  Funds need not first be taken into the public treasury before they are regulated by R.C. 307.86.

Excluding county commissioners from state supervision of their fiscal decisions when they put on the hat of solid waste management district commissioners is contrary to the purpose of competitive bidding.  The recognized purpose of the county competitive bidding statute is the protection of the taxpayers from a bad deal.  Competitive bidding protects the taxpayers from fraud and the temptations of lucrative collusion between public officials and private contractors. *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 21, 552 N.E.2d 202, 204.

To hold this transaction to be beyond the scope of R.C. 307.86 permits the public trust to be displaced by public deal making.  I accordingly dissent.

––––––––––––––––––––