BANK ONE, CINCINNATI, Appellee,

v.

WAIT et al., Appellees[1]; CLARK et al.,[2] Appellants.

[Cite as *Bank One, Cincinnati v. Wait* (1996), 110 Ohio App.3d 460.]

Court of Appeals of Ohio,
Fourth District, Highland County.

No. 95 CA 862.

Decided April 22, 1996.

---

1. Bank One, Cincinnati commenced this foreclosure action against the following six defendants: Carolyn Sue Wait, Charles Paul Wait, Ohio Department of Taxation, Hartley Oil Company, Highland County Treasurer, and Annie Belle Reed.

2. David A. Clark and Ronnie J. Clark purchased the sixty-four acres of real estate in question at the public auction conducted at the front door of the Highland County Courthouse by the Highland County Sheriff on January 20, 1994.

*Manley, Burke, Lipton & Cook* and *Andrew S. Lipton;  Hapner & Hapner* and *Jon C. Hapner,* for appellants.[3]

---

PETER B. ABELE, Presiding Judge.

This is an appeal from a judgment entered by the Highland County Common Pleas Court denying a motion filed by David A. and Ronnie J. Clark, sheriff sale purchasers below and appellants herein.  In the motion the Clarks requested the trial court to issue a writ to the Highland County Sheriff "for service upon Charles Paul Wait, and that the personal property of said Charles Paul Wait which includes numerous automobile or vehicle tires, and a mobile home, be removed from the property as withholding possession of said real estate from the purchasers."  The Clarks' attorney argues on appeal that approximately one hundred thousand scrap tires are on the property.

Appellants assign the following error:

"The court below erred by failing to grant appellants' motion for a writ of possession."

On May 26, 1993, Bank One, Cincinnati, filed the instant foreclosure complaint.  On October 27, 1993, the trial court entered judgment foreclosing on the sixty-four-acre property in question and ordering a sheriff's sale.

On November 18, 1993, the sheriff filed an appraisal valuing the real estate at $15,000.  The sheriff advertised the property for sale on December 23, 1993 for a minimum bid of two-thirds of $15,000.  No one bid on the property at that sale.

On December 13, 1993, the sheriff filed an appraisal valuing the real estate at $24,000.  After the December 23, 1993 sheriff's sale failed for lack of bidders, the sheriff advertised the property for sale on January 20, 1994 for a minimum bid of two-thirds of the $24,000 appraised value.

On January 14, 1994, Paul and Sue Wait filed a motion for a new appraisal of the real estate.  In an appraisal letter attached to the motion, appraiser Ken Juillerat gave his opinion as follows:

---

3. None of the other parties entered an appearance in this appeal.

| | |
|---|---|
| "Normal Market Value $725 × 64 = | $46,400 |
| Deduction for clean-up and removal of tires. (Based on the assumption of approximately 3000–5000 tires on | − 5,000 |
| property and of price to shred said tires as quoted by Owner) | |
| | $41,400" |

On January 19, 1994, the trial court denied the Waits' motion for a new appraisal.

At the January 20, 1994 sheriff's sale, the Clarks purchased the property for $26,400. On February 23, 1994, the trial court entered judgment confirming the sale.

On March 16, 1994, Bank One, Cincinnati, filed a motion for an order compelling the Clarks to pay the $26,400 purchase price. On March 25, 1994, the Clarks filed a response to the motion. In the response, the Clarks (1) moved for an order setting aside the sale, (2) moved for a writ of execution of possession for removal of the scrap tires and the mobile home at the Waits' cost, (3) moved for an order requiring Bank One, Cincinnati and the Waits to dispose of the tires in accordance with federal and state laws, (4) moved for an order dismissing the contempt proceedings against them, and (5) moved for a continuance of the hearing set for April 13, 1994 on this matter. The Clarks explained as follows:

"[R]espondents had to have the property surveyed, and during the survey it was discovered that there were approximately 100,000 tires, tire casings, and discarded tires hidden at the back of the property in one or more locations.

"Respondents have been informed that should they take title to the property they will be prosecuted by the Board of Health of the EPA [sic] for operating a solid waste disposal site. Respondents have further investigated the costs of removal, and have been informed by Rumpke that the costs of removal and disposal of such tires will run from Seventy Five Thousand Dollars ($75,000.00) to Seven Hundred Fifty Thousand Dollars ($750,000.00). * * *

" * * * *

"Respondents further state that while they are willing to purchase the property, they did not purchase, and they are not required to take possession of, the numerous tires on the property or the mobile home on the property."

On April 6, 1994, Bank One, Cincinnati, filed a reply to the Clarks' response. In the reply, Bank One, Cincinnati, argued that the doctrine of *caveat emptor* applies to sheriff sale purchasers.

On April 11, 1994, the trial court continued the hearing on the matter until May 12, 1994. At the May 12, 1994 hearing, the Clarks' attorney explained as follows during opening statements:

"The problem is, as we will develop in this hearing, that there are a number of tires that Mr. Wait was in the tire business, I believe, at New Market, and that there are a number of tires there, anywhere from—we really have no idea— anywhere from fifteen to thirty thousand possibly, and there have been estimates as high as a hundred thousand.

"* * * *

"However, this tire problem, unlike the mobile home, ah, creates a serious problem, because these tires have no intrinsic value to any purchaser, ah, they are a hazard, a solid waste material, in violation of the EPA regulations, ah, in violation of the solid waste disposal regulations of the State of Ohio, that we are not required to buy a prosecution—in other words, to buy a property to be prosecuted by the Government for—and that it is the obligation of the Plaintiffs or the Defendants to clean the property or to clear the property of the solid waste material, the tires.  * * *

" * * * [T]hey've got an illegal solid waste material dump there that has to be cleaned up or removed."

The Clarks' mother, Betty L. Clark, testified that when she examined the property prior to purchasing it at the sheriff's sale on behalf of her sons David and Ronnie, she observed two or three tires in the snow, and a pile of what she thought was fewer than one hundred tires. She further testified that because there was so much snow on the ground at the time, the four-wheel drive vehicle she was riding in could not take her to examine the back part of the property. After the sheriff's sale, she learned that many, many more tires were on the back part of the property. On cross-examination, she testified that the vast majority of the property does not have tires on it.

Max Cummins, who operates a tire disposal facility in Kentucky, testified that he estimates there are thirty-five thousand to forty thousand tires on the property. Cummins testified that he could remove the tires from the property for $1 per tire.

Joe Evans, an assistant operations manager at Rumpke, a company engaged in the collection and disposal of scrap tires, testified that he estimates there are two hundred thousand tires on the property. Evans testified that he could dispose of the tires for between $400,000 to $500,000, if someone else would bring the tires from the back of the property to the side of the road in the front of the property.

Mary Ann Webb, the Highland County Health Department Director of Environmental Health, testified that she estimates that one hundred thousand tires

are on the property. Webb further testified that Betty L. Clark had filed a written complaint about the tires.

On May 27, 1994, the trial court issued a decision and judgment entry granting Bank One, Cincinnati's motion for an order compelling the Clarks to pay the $26,400 purchase price.[4] Although the Clarks made various motions in their response to Bank One, Cincinnati's motion, including a motion for a writ of execution of possession for removal of the scrap tires and the mobile home at the Waits' cost, the trial court did not include rulings on those motions in the May 27, 1994 decision and judgment entry.

On July 11, 1994, the Clarks moved for an order of execution for delivery of possession of the real estate. In the motion, the Clarks requested the trial court to issue a writ to the Highland County Sheriff "for service upon Charles Paul Wait, and that the personal property of said Charles Paul Wait which includes numerous automobile or vehicle tires, and a mobile home, be removed from the property as withholding possession of said real estate from the purchasers."

On July 21, 1994, the Waits responded to the motion in full as follows:

"NOW COME the Defendants and stat[e] that they have no objection to the pending motion for a writ of possession of the premises except that the Defendants reserve the right to remove the mobile home on the premises. Any other personal property located on said real estate was purchased by the successful bidders at the Sheriff's Sale and is accordingly the sole property of the purchasers."

The trial court heard the motion on September 16, 1994. At the hearing, Betty L. Clark testified that the she removed 1,244 tires from the pile which she saw prior to the sheriff's sale and had estimated contained fewer than one hundred tires. Paul Wait testified that he and his sons Chuck and Randy placed the tires on the property. He further testified that he thought there were ten to fifteen loads of one thousand to thirteen hundred tires on the property, and he thought it would cost $5,000 to remove the tires. Wait objected to the fact that the property, which he believed is worth $65,000, sold for only $26,400 at sheriff's sale.

During closing arguments, the Clarks' attorney argued in part that "equity requires the wrongdoer to remedy the situation." The Clarks' attorney further argued as follows:

---

4. On January 18, 1995, the Clarks filed a notice of appeal from the trial court's May 27, 1994 decision and judgment entry. On July 24, 1995, we dismissed that appeal due to the Clarks' failure to file their notice of appeal in a timely manner. See *Bank One, Cincinnati v. Wait* (July 24, 1995), Highland App. No. 95 CA 868, unreported.

"Now, we're not suggesting that the Sheriff personally go out and do that; but, we are suggesting that the order should compel Mr. Paul Wait, who is a Defendant, ah, to remove these tires, ah, from the property. They are his personal property. They are not the Clarks' personal property. They did not buy them in this matter. And, permitting the tires to remain there is to give possession of that particular area to the Waits."

On November 10, 1994, the trial court entered judgment denying the Clarks' motion for the reason that the scrap tires cover only five acres of the property and do not prevent the Clarks from taking possession of the entire property. The trial court wrote in full:

"This matter came before the Court on September 16, 1994 on motion of the purchasers at the foreclosure sale for delivery of the possession of the real estate, that is, for the Court to issue a writ to order Paul Wait to remove tires from the property.

"The testimony was that the tires in question cover approximately five acres of the property purchased and do not prevent the purchasers from taking possession of the total acreage purchased.

"For this reason the purchasers are not entitled to the relief requested.

"The motion for issuance of the writ is overruled."

The Clarks filed a timely notice of appeal from the above judgment on December 9, 1994.

In their sole assignment of error, appellants assert that the trial court erred by failing to grant their "motion for a writ of possession." Appellants cite 1978 Ohio Atty.Gen.Ops. No. 78–015 and 1933 Ohio Atty.Gen.Ops. No. 1913, 1810, in support of their argument. In those opinions, the Attorney General stated that a writ of possession orders the sheriff to remove occupants and their personal property from the real estate in question. Appellants also cite *Kuebler Brewing Co. v. McGuire* (1901), 8 Ohio N.P. 300. In that case, the court similarly held that a writ of possession requires the sheriff to remove the occupants and their personal property from the real estate.

We note that in *State ex rel. Marsol Apt. Co. v. Vannuci* (1980), 68 Ohio App.2d 181, 22 O.O.3d 279, 428 N.E.2d 468, the court extensively quoted and followed *Kuebler Brewing Co., supra*. In *Marsol Apt. Co.*, the court issued a writ of mandamus compelling the trial court in a forcible entry and detainer action to order the bailiff to cause the removal of the tenant's personal property from the premises. The court wrote as follows:

"The issue confronting this court in the case at bar is whether the right to restitution of the premises includes the right to have the property of the unlawful possessor removed from the premises pursuant to court order.

"We hold that, under Ohio law, where a party prevails in an action for forcible entry and detainer, it is the clear legal duty of the bailiff to remove defendant's (tenant's) possessions as well as his person from the premises after the writ of restitution has been issued by the court in order to effect the restitution of the premises to the lawful owner. See *Kuebler Brewing Co. v. McGuire* (Ct. of Common Pleas of Lorain Co., 1901), 8 Ohio N.P. 300. * * *" *Marsol, supra,* 68 Ohio App.2d at 183, 22 O.O.3d at 281, 428 N.E.2d at 470.

*Marsol* appears to support appellants' argument that a writ of possession requires removal of not only the occupant, but also the occupant's personal property. We note, however, that for many reasons we can distinguish the case *sub judice* from *Marsol* and the authorities cited by appellants.

First, we note that *Marsol* and the authorities cited by appellants involved orders directed to the sheriff or the bailiff. In the case *sub judice*, although appellants claim that they are seeking a writ of possession, appellants requested the trial court to order Paul Wait, rather than the sheriff, to remove the tires from the property. In 1978 Ohio Atty.Gen.Ops. No. 78–015, the Attorney General noted that sheriffs execute writs of possession:

"In summary, the purchaser of real property at a judicial sale may obtain actual possession thereof through one of two methods where an occupant of the premises who was a party to the foreclosure proceedings refuses to vacate voluntarily. The purchaser is entitled to both a sheriff's deed and *writ of possession, which must be executed by the county sheriff,* who has a duty to deliver actual and exclusive possession to the purchaser, even where such delivery requires forcible removal of the occupant." (Emphasis added.)

Appellants claim they filed their motion for a writ of possession pursuant to R.C. 2327.02(C). That statute contemplates that the sheriff will execute the writ of possession. Appellants cite no authority permitting the trial court to issue a writ of possession ordering a nonlaw-enforcement officer to execute the writ. We note that in *Marsol,* the court commented that the apparent intent of the General Assembly in the enactment of R.C. 5321.15, the statute prohibiting landlords from removing the personal property of tenants, was to "minimize hardships and breaches of the peace which frequently accompany dispossessions carried out by private parties." *Id.,* 68 Ohio App.2d at 185, 22 O.O.3d at 282, 428 N.E.2d at 471. To permit nonlaw-enforcement officers to execute writs of possession would

frustrate the apparent intent of R.C. 2327.02(C).[5]

We readily acknowledge that in the case *sub judice* appellants requested the trial court to order Paul Wait to remove the tires and therefore probably would not interfere with any efforts by Paul Wait to remove the tires. Therein lies the second and perhaps most important reason why we distinguish the case *sub judice* from *Marsol* and the authorities cited by appellants: the tires have a substantial negative impact on the value of the real property. Although generally the personal property described in a writ of possession does not have a substantial negative effect on real property, in the case *sub judice* appellants openly argue that the tires constitute an illegal scrap tire dump.

During the proceedings below, Paul Wait argued that the tires no longer belong to him, but were purchased by appellants when they purchased the real property. During closing argument on September 16, 1994, Paul Wait's attorney argued as follows:

"We would submit to the Court that all these appraisals took into consideration the fact of the condition of the premises, including the tires themselves.

"Now, Mr. Wait testified that he paid $40,000.00 for the property in 1980, and it brings, at Sheriff's Sale, $26,000.00. Further evidence, Your Honor, that the parties and the bidders were taking into consideration the tires would have to be removed.

"To say now that Mr. Wait must come in and remove the tires is to deprive him of the benefit of the bargain that he made.

---

5. It appears that appellants, by requesting the trial court to order Paul Wait (rather than the sheriff) to remove the tires, wants Paul Wait to bear the removal costs.

We note that if appellants had requested the trial court to issue a writ of possession ordering the sheriff to remove the tires, Paul Wait theoretically would bear the removal costs. In *State ex rel. Marsol Apt. Co. v. Vannuci* (1980), 68 Ohio App.2d 181, 22 O.O.3d 279, 428 N.E.2d 468, the court described who pays for the execution of a writ of possession of writ of restitution as follows:

"If the landlord fails to furnish the bailiff with the manpower to effectuate the actual removal of the property from the premises, we hold that the court may initially impose on the landlord the expense of removing the tenant's possessions. This expense should, however, ultimately be assessed against the tenant, either as court costs or in the form of a supplemental judgment for damages in favor of the landlord. [Footnote omitted.] We also hold that the landlord may not be charged for the cost of storing the property since his responsibility for the property ends when the property is lawfully removed from the premises. * * *" See, also, *Markovich v. Hunt* (Jan. 19, 1995), Lawrence App. No. 94 CA 16, unreported, 1995 WL 25337, where we held that if the purchaser removes the property, the purchaser may recover the removal costs from the seller.

As we discuss below, however, the tires in the case *sub judice* are not the typical personal property left by a defaulting mortgagor and subject to a writ of possession after sheriff's sale or left by a tenant and subject to removal by the landlord. The tires have a substantial negative impact on the value of the property and, in appellants' attorney's words, amount to "an illegal solid waste material dump."

" * * *

"It's their property; they bought it; and they bought it under conditions at the sale, and that was as is. Thank you."

Clearly, Paul Wait no longer wants the tires.

At this juncture, we arrive at the third reason why we distinguish the case *sub judice* from *Marsol* and the authorities cited by appellants. Case law supports the conclusion that to the extent, if any, that the tires were not included in the sale of the real property, Paul Wait has abandoned the tires. In *Hamilton v. Harville* (1989), 63 Ohio App.3d 27, 577 N.E.2d 1125, the court defined "abandonment" as follows:

"The word 'abandonment' has been discussed by this court in *Davis v. Suggs* (1983), 10 Ohio App.3d 50, 52, 10 OBR 59, 61, 460 N.E.2d 665, 668, as an ' " * * * absolute unequivocal relinquishment of a right or status without regard to self or any other person. It is a virtual throwing away without regard as to who may take over or carry on. It is a total discarding of what existed or went before; and evidence thereof must be direct, affirmative or reasonably beget the exclusive inference of throwing away." ' "

In *Markovich v. Hunt* (Jan. 19, 1995), Lawrence App. No. 94 CA 16, unreported, 1995 WL 25337, we followed *Hamilton* as follows:

"In order to abandon property, the owner must unequivocally relinquish the rights to it so that the owner's conduct amounts to a virtual throwing away or total discarding of the property. See *Hamilton v. Harville* (1989), 63 Ohio App.3d 27, 577 N.E.2d 1125." See, also, *Keish v. Russell* (Feb. 17, 1995), Athens App. No. 94 CA 1618, unreported, 1995 WL 75388.

The evidence in the case *sub judice* overwhelmingly supports the conclusion that Paul Wait, whether by sale or by abandonment, has relinquished possession of the tires.

We note that at least two other appellate cases in Ohio have confronted the troublesome problem of scrap tires abandoned on real property. In *State ex rel. J.K. & E. Auto Wrecking v. Trumbo* (June 11, 1991), Cuyahoga App. No. 61230, unreported, 1991 WL 106064, approximately five thousand tires accumulated on the real property during the tenant's stay. Although the landlord won a writ of restitution in the Cleveland Municipal Court's Housing Division, the bailiff could not remove the tires because he had no facilities to store them. The landlord then demanded the Cleveland Municipal Court's Housing Division to issue mandatory injunction ordering the tenant to remove the tires. Four days later, the landlord filed a nearly identical action in the Cleveland Municipal Court's General Division. In this second complaint, the landlord also sought compensation for the cost of obtaining physical possession of the real property by removing

the tires. The tenant filed a petition for writ of prohibition preventing the Cleveland Municipal Court from ruling on the second action. The appellate court granted the writ of prohibition, finding that the general division had no jurisdiction over the matter and transferring the matter to the housing division. Our research does not reveal the success of the landlord's quest for a mandatory injunction.

In *Walton v. Frame* (Aug. 5, 1994), Washington App. No. 93 CA 24, unreported, 1994 WL 419983, the previous landowners accumulated hundreds of thousands of used tires during the 1970s. They planned to fill a ravine on the property with the tires to create additional parking spaces for the country and western shows they held on the property. When the real property was sold in 1982, the purchasers insisted on a contract provision requiring the previous owners to cover the tires with twelve inches of dirt. Because the tires would not support the weight of a bulldozer, the sellers' contractor could not cover all the tires in the ravine.

The *Walton* purchasers took no action against the sellers until after 1991 when the Ohio Department of Natural Resources and the Washington County Department of Health informed the purchasers that they must remove the tires from the ravine. On appeal, the purchasers argued that because the sellers dumped the tires, equity requires that they indemnify the purchasers for the costs of clean up. The sellers argued that because the parties apportioned the cost of correcting the tire problem in the contract, the purchasers cannot now seek equitable relief. We agreed with the sellers.

■ Now we arrive at the fourth reason why we distinguish the case *sub judice* from *Marsol* and the authorities cited by appellants. During the proceedings below, Bank One, Cincinnati argued that the doctrine of *caveat emptor* applies to the real property. We agree. In *Layman v. Binns* (1988), 35 Ohio St.3d 176, 519 N.E.2d 642, the court wrote:

"The doctrine of *caveat emptor*, although virtually abolished in the area of personal property, remains a viable rule of law in real estate sales. 7 Willison, Contracts (Jaeger 3 Ed.1963) 779, Section 926; Friedman, Contracts and Conveyances of Real Property (4 Ed.1984) 37, Section 1.2(n); Kafker, Sell and Tell: The Fall and Revival of the Rule of Nondisclosure in Sales of Used Real Property (1986), 12 U.Dayton L.Rev. 57, 58–63.

"In *Traverse v. Long* (1956), 165 Ohio St. 249, 252, 59 O.O. 325, 326–27, 135 N.E.2d 256, 259, this court articulated the rule as follows:

" 'The principle of *caveat emptor* applies to sales of real estate relative to conditions open to observation. Where those conditions are discoverable and the purchaser has the opportunity for investigation and determination without con-

cealment or hindrance by the vendor, the purchaser has no just cause for complaint even though there are misstatements and misrepresentations by the vendor not so reprehensible in nature as to constitute fraud. * * * '

" * * * Accordingly, we are not disposed to abolish the doctrine of caveat emptor. A seller of realty is not obligated to reveal all that he or she knows. A duty falls upon the purchaser to make inquiry and examination.

" 'To make the doctrine operate fairly, courts have established certain conditions * * * as follows': (1) the defect must be open to observation or discoverable on reasonable inspection, (2) the purchaser must have an unimpeded opportunity to examine the property and (3) the vendor may not engage in fraud."

In the case *sub judice,* the tires were open to observation and discoverable by anyone who chose to examine the real estate. Appellants' mother testified that she observed a pile of tires on the premises, and later counted 1,244 tires in that pile. No one prevented appellants or their mother from walking over the property. The record transmitted on appeal contains no evidence of fraud.

If appellants had examined the court file prior to the sale, appellants would have learned that the real property contained a significant number of tires. In an appraisal letter attached to Paul and Sue Wait's January 14, 1994, motion for a new appraisal of the real estate, appraiser Ken Juillerat wrote that thousands of tires on the property reduce the value of the property. Paul Wait testified that the property sold for significantly less than it would have sold for without the tires.

We acknowledge that it is possible that no one knowing that the property contained tens of thousands of scrap tires would have purchased the property at sheriff's sale. Some testimony at trial indicates that when the cost of removal of the tires is taken into account, the property has a negative value. Another question that arises is whether the mortgagee, Bank One, Cincinnati should be held liable for removing of the scrap tires. In *Hausman v. Dayton* (1995), 73 Ohio St.3d 671, 653 N.E.2d 1190, the Ohio Supreme Court held that the Dayton ordinance at issue unconstitutionally and arbitrarily held the mortgagee liable for the abatement of the PCBs and friable asbestos on the real estate in question. The court held at paragraph one of the syllabus as follows:

"After a mortgagor defaults, legal title passes to the mortgagee only as between the mortgagor and the mortgagee. As to the rest of the world, title remains in the mortgagor until the mortgagee forecloses on the mortgage and the sale is consummated, the mortgagee recovers possession of the property by ejectment proceedings, or the mortgagee otherwise extinguishes the right of the mortgagor to redeem. (*Levin v. Carney* [1954], 161 Ohio St. 513, 53 O.O. 390, 120 N.E.2d 92, followed.)" See, also, *Trustcorp Bank v. Cartier* (Oct. 30, 1992), Lucas

App. No. L–91–337, unreported, 1992 WL 313323, in which the court held that a mortgagee who did not purchase the real property at sheriff's sale is not responsible as an owner to abate a nuisance existing on that property.

Thus, it appears that the mortgagee in the case *sub judice* bears no responsibility for removal of the scrap tires.

Although we agree with the trial court's judgment and we decline to grant appellants an order forcing Paul Wait to remove the tires from the real estate, we note that appellants may wish to consider R.C. 3734.85 and 3734.101. R.C. 3734.85, Ohio's scrap tire law, aims to force the "person responsible for the accumulation of scrap tires" to bear the cost of complying with environmental laws concerning the storage and disposal of scrap tires. In the case *sub judice*, Paul Wait testified that he and his sons Chuck and Randy are the persons responsible for the accumulation of the scrap tires. Although R.C. 3734.85 permits the Ohio Environmental Protection Agency director to issue an order against the owner to remove scrap tires within one hundred and twenty days, the law requires the director to first attempt to ascertain the identity of the person responsible for causing the accumulation of the scrap tires, and, if the identity of that person is ascertained, the director must first issue an order against that person. If the person fails to comply with the one-hundred-twenty-day removal order, the director shall take such action as he considers reasonable and necessary to remove and properly manage the scrap tires located on the land named in the order. After the scrap tires are managed and/or removed, the director may request the Attorney General to bring a civil action for the director's cost relative to the tires against the person responsible for causing the accumulation of scrap tires. If the director is unable to recover those costs, the director may cause the county recorder to place a lien on the property. If a lien is placed on the property, the landowner may bring a civil action to recover those costs from the person responsible for causing the accumulation of scrap tires on the property. The action must be brought within two years of the date the director certified the costs to the county recorder for placement of a lien on the property.

In addition, appellants could possibly bring a citizen's suit against Paul Wait and his sons Chuck and Randy pursuant to R.C. 3734.101. In *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 653 N.E.2d 646, the Ohio Supreme Court described R.C. 3734.101 as a statutory framework providing "a method of private enforcement by which any person aggrieved or adversely affected by an alleged violation of R.C. Chapter 3734 * * * may commence a legal action in the court of common pleas in the county where the alleged violation occurred." In *State ex rel. Schoener v. Hamilton Cty. Bd. of Commrs.* (1992), 84 Ohio App.3d 794, 619 N.E.2d 2, the court held that an

order compelling compliance with environmental laws is the only form of relief contemplated by R.C. 3734.101.

Accordingly, based upon the foregoing reasons, we overrule appellants' sole assignment of error.

*Judgment affirmed.*

STEPHENSON and KLINE, JJ., concur.