[Cite as *Summit Pointe Home Owners Assn., Inc. v. Neslen*, 2013-Ohio-2643.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| SUMMIT POINTE HOME OWNERS ASSOCIATION, INC., | : | CASE NO. CA2012-11-111 |
| | : | |
| Plaintiff-Appellant, | : | O P I N I O N |
| | : | 6/24/2013 |
| - vs - | : | |
| | : | |
| CRAIG NESLEN, et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 2011-CV-80518

Scott G. Oxley, 325 North Main Street, Suite 204, Springboro, Ohio 45066, for plaintiff-appellant

Sue Seeberger, 5975 Kentshire Drive, Dayton, Ohio 45440, for defendants-appellees

**S. POWELL, J.**

{¶ 1} Plaintiff-appellant, Summit Pointe Home Owners Association, Inc. (Summit Pointe), appeals a decision of the Warren County Court of Common Pleas finding in favor of defendants-appellees, Craig and Dawn Neslen, on its complaint for injunctive relief requiring the Neslens to remove a shed from their property.

**{¶ 2}** Craig and Dawn Neslen are owners of a residence located within the Summit Pointe Subdivision in Warren County, Ohio.[1] Summit Pointe operates a homeowners association within this subdivision. Summit Pointe provides services to unit owners and association members in the neighborhood. The subdivision, including the Neslens' property, is subject to the terms and provisions found in the Declaration of Covenants, Conditions, and Restrictions (CCRs) for Summit Pointe. Article 1 of the CCRs contain several use restrictions on the owners within the association. Article 1 provides in part:

> ### Article 1. <u>Use Restrictions</u>
>
> * * *
>
> 1.02   No residence, building, porch, deck, fence, flagpole, mailbox, light pole or fixture, swimming pool, pavement, driveway, awning, wall or structure of any kind shall be erected, placed or altered on any Building Lot without first obtaining the written consent of the Architectural Control Committee subsequently described herein. All requests for written approvals from the Architectural Control Committee shall be accompanied by detailed plans and specifications for the proposed improvements showing, where applicable, the size, location, type, architectural design, spacing, quality, use, construction materials, color scheme, grading plan and finish grade elevation for said improvements
>
> * * *
>
> 1.25   No barns, storage sheds or other outbuildings shall be permitted on any Building Lot.

**{¶ 3}** The CCRs also established the Architectural Control Committee (ACC), a standing committee of the association, comprised of three members, which was responsible for reviewing applications for improvements to a Building Lot. Article 4 of the CCRs describes the duties and powers of the ACC. Article 4 provides in part:

> 4.03   The use restrictions require the submission of detailed plans and specifications to the Committee prior to the erection of,

---

1. For purposes of clarity, we will refer to Craig Neslen as "Neslen" and Dawn and Craig Neslen collectively as "the Neslens."

placement on, or alteration of any structure or improvement on any Building Lot. The intent is to achieve an architecturally harmonious, artistic and desirable residential subdivision. Therefore, while considering the approval or disapproval of any plans and specifications submitted, the Committee is directed to consider the appropriateness of the improvement contemplated in relation to the improvements on contiguous or adjacent lots, the artistic and architectural merits of the proposed improvement, the adaptability of the proposed improvement to the Building Lot on which it is proposed to be made, and such other matters as may be deemed by the Committee members to be in the interest and benefit of the owners of the Building Lots in the Subdivision as a whole.

* * *

4.05   The Committee's decisions shall be in writing and shall be binding upon all parties in interest. The Committee shall approve, disapprove or request additional information with respect to any request for approval within thirty (30) days after the request shall have been submitted to the Committee for approval. The failure of the Committee to approve, disapprove or request additional information within said time period shall be deemed an approval of any request.

4.06   If, in the opinion of the Committee, the enforcement of these restrictions would constitute a hardship due to the shape, dimension or topography of a particular Building Lot in the Subdivision, the Committee may permit a variation which will, in its judgment, be in keeping with the maintenance of the standards of the subdivision.

{¶ 4} On June 12, 2011, Neslen submitted an improvement application by e-mail to the ACC and to Summit Pointe's management agent, Community Management Solutions (CMS), seeking approval to build a 10 feet by 11 feet lean-to shed on his property. Attached to the application were three pages of detailed drawings of the proposed outdoor improvement.

{¶ 5} A few days after receiving the application, one of the ACC members, Sherry West Beaudoin, contacted Neslen by telephone. Beaudoin testified that during this conversation, she "essentially" rejected the application and advised Neslen that she "had no authority" to consider the application because 1.25 of the CCRs prohibited storage sheds and

outbuildings. Neslen, however, testified that during this call, Beaudoin merely expressed her belief that the application would be rejected. Neslen also testified that Beaudoin told him she would pass the application to the Board and either the Board or CMS would respond to his application.

{¶ 6} By July 12, 2011, the Neslens still had not received a decision from the ACC, the Board or CMS either approving or disapproving the proposed construction. Finally, on July 19, 2011, Shawna Guajardo with CMS sent Neslen an e-mail stating: "We do not have the authority to approve a 'shed' because Summit Pointe bylaws [sic] prohibit sheds." Neslen testified that he saw this e-mail on July 26, 2011. On July 25, 2011, Neslen sent an email to Summit Pointe stating: "I have, to date, received no formal approval, disapproval or request for additional information or clarification either by formal mail, e-mail or phone call. Therefore in accordance with [the CCRs] 4.05, I will begin construction of the proposed structure."

{¶ 7} After receiving this e-mail, Summit Pointe provided several letters and e-mails to Neslen, which purported to deny his application. Particularly, Beaudoin sent Neslen an e-mail which reminded him of their telephone conversation and that his "request was going to be denied." The Board also sent a letter dated July 26, 2011, which stated that the ACC had denied his request for a shed.

{¶ 8} Despite these letters, the Neslens began construction of the shed in August or September of 2011. On September 13, 2011, Summit Pointe filed a verified complaint seeking a temporary restraining order, preliminary and permanent injunctive relief, and damages. The complaint sought to enjoin the Neslens from violating a restrictive covenant, and requiring them to remove the shed. The Neslens answered. The temporary restraining order was denied, and a hearing on the merits of the injunction and damages was held on January 18, 2012. After considering the evidence, the magistrate found the covenant could not be enforced against the Neslens and that judgment should be entered in their favor. In

reaching this decision, the magistrate found Summit Pointe was required, under 4.05, to issue a timely written decision to Neslen's application, the failure to do so effectively approved the construction of the shed by the default provision of 4.05. Summit Pointe filed objections to the magistrate's decision. The trial court overruled these objections and entered judgment in favor of the Neslens. Summit Pointe timely appealed, raising three assignments of error for our review.

{¶ 9} Assignment of Error No. 1:

{¶ 10} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF/APPELLANT IN FINDING THAT PLAINTIFF WAS REQUIRED TO NOTIFY DEFENDANTS IN WRITING WITHIN THIRTY (30) DAYS OF DEFENDANTS APPLICATION.

{¶ 11} Assignment of Error No. 2:

{¶ 12} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF/APPELLANT IN FINDING THAT THE ARCHITECTURAL CONTROL COMMITTEE SERVED THE FUNCTION TO APPROVE, DISAPPROVE OR REQUEST ADDITIONAL INFORMATION FOR APPLICATIONS STRICTLY PROHIBITED BY THE CCR'S.

{¶ 13} We recognize that a trial court's decision to grant or deny an injunction is reviewed by this court for an abuse of discretion. *Ray v. Bd. of Union Twp. Trustees*, 12th Dist. No. CA2006-06-039, 2007-Ohio-3001, ¶ 10, citing *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgmt. Dist.*, 73 Ohio St.3d 590, 604. However, the trial court first had to interpret provisions within the CCRs before it could entertain the claim for injunctive relief. The construction of written instruments, including deeds, is a matter of law that we review de novo. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus; *see also Cartwright v. Allen*, 12th Dist. No. CA2011-10-025, 2012-Ohio-3631, ¶ 10.

{¶ 14} Summit Pointe's first and second assignments of error each challenge the trial court's interpretation of certain provisions and restrictive covenants contained within the CCRs. Ordinary rules of contract construction are used to construe a restrictive covenant. *Fettro v. Rombach Ctr., LLC*, 12th Dist. CA2012-07-018, 2013-Ohio-2279, ¶ 12; *Dillingham v. Do*, 12th Dist. Nos. CA2002-01-004 and CA2002-01-017, 2002-Ohio-3349, ¶ 18. Thus, covenants should be construed consistent with the parties' intent. To determine the parties' intent, we must look to the language of the covenant itself. *Dillingham* at ¶ 18; *Todd Dev. Co., Inc. v. Morgan*, 12th Dist. No. CA2005-11-124, 2006-Ohio-4825, ¶ 32, *rev'd on other grounds*, *Todd Dev. Co., Inc. v. Morgan*, 116 Ohio St.3d 461, 2008-Ohio-87. The language should be given its common, ordinary meaning in light of the circumstances surrounding the creation of the covenant. *Dillingham* at ¶ 18. "If the language is unambiguous, the restriction must be enforced as written." *Morgan* at ¶ 32.

## A. Interpretation of 4.05

{¶ 15} In its first assignment of error, Summit Pointe argues that Section 4.05 is written in the "disjunctive." Summit Pointe asserts that Section 4.05 contains two separate requirements: (1) that decisions by the ACC be made in writing, and (2) that the ACC's approval, disapproval or request for additional information on an application for improvement be made within 30 days. Summit Pointe contends that these two separate requirements were met because the ultimate decision, denying Neslen's request to construct a shed was denied in writing by a letter from the Board dated July 26, 2011, and the ACC's disapproval of the application occurred within 30 days as Beaudoin communicated the disapproval to Neslen during the telephone conversation in June 2011. Summit Pointe argues the trial court erred by reading these two sentences together and finding that the ACC's decision to approve, disapprove or request additional information on an application must be made *both* in writing *and* within 30 days. Summit Pointe's argument is unpersuasive. Summit Pointe's

interpretation of Section 4.05 is simply not warranted by the language of the section.

{¶ 16} The language of Section 4.05 is clear and unambiguous. It simply means exactly what is written and cannot be interpreted to mean anything else. Section 4.05 clearly requires the ACC to render in writing, its decision to approve, disapprove or request additional information as to an application for adding an improvement to a member's property. The final sentence in Section 4.05 in no uncertain terms, states that the failure of the ACC to issue such a written decision within the 30 day time period is deemed to be an approval of any request.

{¶ 17} Even in light of this clear and unambiguous language, Summit Pointe urges us to construe the requirements under Section 4.05 to allow the ACC to communicate an approval, disapproval or request for additional information by any means, including verbal notice. Section 4.05 simply does not allow for the communication of the ACC's decision in this manner. Rather, as Section 4.05 states, the "Committee's decisions *shall be in writing.*" (Emphasis added.) The intent of this provision is for the ACC to provide homeowners with a prompt *written* response to a request to make an improvement on their property as contemplated by the CCRs. This is further exemplified by the language used in Section 1.02. This section states that no "building * * * or structure of any kind shall be erected * * * without first obtaining *the written consent of the [ACC]* * * *. *All requests for written approvals from the [ACC]* shall be accompanied by detailed plans."

{¶ 18} Given the language of Section 4.05, the ACC was required, in writing, to approve, disapprove, or request additional information within 30 days of the Neslen's request for approval to add a shed to their property or else it was deemed approved. As ACC did not render a decision in writing approving, disapproving, or requesting additional information on the Neslen's request, within 30 days, the trial court correctly found that the ACC approved the application pursuant to Section 4.05.

{¶ 19} As the trial court properly found that Neslen's application was not properly denied by the ACC, and therefore deemed approved, the trial court did not abuse its discretion in denying Summit Pointe's request for an injunction.

{¶ 20} Summit Pointe's first assignment of error is overruled.

## B. The ACC's obligations under the CCRs

{¶ 21} In its second assignment of error, Summit Pointe argues that Article 4 does not give the ACC the power or authority to accept, reject or even consider applications from homeowners which request approval to make an improvement on their property which is strictly prohibited by the CCRs. Rather, Summit Pointe asserts the ACC is only able to approve, disapprove or request additional information pertaining to the submission of plans that are "actually allowed to be constructed consistent with the CCRs." Summit Pointe further contends that because sheds are strictly prohibited by Section 1.25, "neither the [ACC] nor the Board can ever approve construction of a storage shed."

{¶ 22} The trial court, in overruling Summit Pointe's objections to the Magistrate's Decision, rejected this argument, finding that construing the use restriction in Section 1.25 such that no action is required by the ACC is "rigid" and "unreasonable." We agree with the trial court.

{¶ 23} Article 4 empowers the ACC to consider plans and specifications, submitted by homeowners, for the erection of, placement on or alteration of any structure or improvement on any Building Lot. As mentioned in Sections 4.03 and 1.02, the use restrictions require homeowners to obtain written approval by the ACC before any structure or improvement is made to the property. Section 4.03 refers to the "use restrictions" without limitation. Section 1.02 similarly indicates that written approval of the ACC is required before erecting a *structure of any kind.* Neither of these sections provide for any exception to this written approval requirement when the request relates to a specific use restriction or a specific type

of structure. Additionally, Section 4.05 states that the ACC "shall approve, disapprove or request additional information with *respect to any request.*" (Emphasis added.) The language used in these sections is clear and unambiguous. The ACC may consider all use restrictions and any detailed plans or specifications for the erection of any structure or improvement to a Building Lot.

{¶ 24} Moreover, the use of the words *any request* in Section 4.05 indicates the parties' intent that the ACC is required to issue a decision on any request made by a homeowner. The approval or disapproval by the ACC is not limited to those requests that are not specifically prohibited by the CCRs. If the parties had intended the ACC to only consider those requests that were in compliance with the use restrictions of Article 1, then it should have stated as much. Certainly, the ACC was entitled to disapprove Neslen's request based on Section 1.25, yet, the failure to timely do so, as described above, effectively approved the request. The mere fact that Section 1.25 entitled the ACC to disapprove the application does not mean that they were not required to consider the application.

{¶ 25} Based on the clear and unambiguous language of Sections 1.02, 4.03, 4.05, and 4.06 we find the trial court did not err in finding the ACC had the authority to consider all requests for approvals and not just those "actually allowed" by the CCRs. Accordingly, the trial court did not abuse its discretion in denying Summit Pointe's request for an injunction.

{¶ 26} Assignment of Error No. 3:

{¶ 27} THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF/APPELLANT BY RELYING ON LISY V. MAYFAIR ESTATES IN SUPPORT OF THE MARCH 6, 2012 DECISION.

{¶ 28} In its third and final assignment of error, Summit Pointe asserts the trial court erred by relying on *Lisy v. Mayfair Estates Homeowners Assn., Inc.*, 9th Dist. No. 25392, 2012-Ohio-68, in denying its request for an injunction. Summit Pointe argues that the facts in

the present case are "not at all similar to the *Lisy* situation" such that the trial court erred in relying on it.

{¶ 29} In *Lisy*, homeowners were subject to a declaration of covenants. The covenants, similar to the ones at issue here, provided that the homeowners association board of trustees "must render its decision in respect to any plans or specifications submitted to it and give notice thereof to an owner within seven (7) days after the owner delivers [the plans or specifications]. Failure to give notice of its decision within said 7 days shall be deemed to be an approval of the plans and specifications submitted." *Id.* at ¶ 15. The *Lisy* court found that the Board effectively approved a homeowner's request for approval of plans to build an outbuilding based on the above language where the Board failed to expressly approve or deny the plan within 7 days. *Id.* at ¶ 17.

{¶ 30} After a review of the decision in *Lisy*, we find that *Lisy* is factually similar to the case at bar. Moreover, "all opinions of the courts of appeals issued after May 1, 2002 may be cited as legal authority and weighted as deemed appropriate by the courts." Rep.Op.R. 3.4. In light of the facts present in this case, the trial court appropriately gave the *Lisy* decision some weight in interpreting a similar default approval provision. Accordingly, the trial court did not abuse its discretion in using the *Lisy* decision to guide its determination in this matter.

{¶ 31} Summit Pointe's third and final assignment of error is overruled.

{¶ 32} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.